[Civ. No. 7351. Fifth Dist. Mar. 14, 1984.]

In re DAVID C., a Minor.
MERCED COUNTY DEPARTMENT OF HUMAN RESOURCES,
Petitioner and Respondent, v.
ISMAEL C. et al., Objectors and Appellants.

**COUNSEL**

Howard Tangle, under appointment by the Court of Appeal, and Carole Greeley for Objectors and Appellants.

William E. Gnass, County Counsel, and Gerald W. Goodsell, Deputy County Counsel, for Petitioner and Respondent.

Robert T. Haden, under appointment by the Court of Appeal, for Minor.

**OPINION**

**ZENOVICH, J.**—Appellants, Ismael C. and Gloria Y., appeal from an order of the Merced County Superior Court declaring their son, David C., free from their custody and control pursuant to Civil Code section 232, subdivisions (a)(2) and (a)(7).[1]

---

[1] All references are to the Civil Code unless otherwise mentioned.

On October 9, 1981, respondent, Merced County Department of Human Resources (DHR) filed a petition to declare David C. free from his parents' custody and control. The petition alleged, among other things, that David C., born in July 1975, was declared a dependent of the juvenile court on September 30, 1976, because he was suffering from "chronic malnutrition." The petition also alleged that the natural parents of David C. had been deprived of custody of the minor for a period of one year prior to the filing of the petition. The petition asserted that David C. had been placed in foster homes continually since July 17, 1979, a period in excess of two years. Finally, the petition alleged that the return of David C. to his parents would be detrimental to him, and the parents "have failed since July 17, 1979, and are likely to fail in the future, to do the following: "1. provide a home for the minor, 2. provide care and control for the minor, and 3. maintain an adequate parental relationship with the minor."

A hearing was set for November 20, 1981, but the matter was continued for six months, during which time the parents were to "successfully complete counseling and parenting sessions . . . ." Pursuant to this stipulation, the parents were to attend all sessions and appointments as scheduled by mental health and/or other professional counseling service. The stipulation stated that visits with the minor child would resume and would gradually increase in frequency and length provided the parents would comply with the counseling and parenting program. The natural parents were to initiate the visits. In addition, the DHR was to acquire a complete physical examination of David and a psychological evaluation of the natural parents and minor child was to be conducted at the end of five months from the date of the stipulation. The parents were to cooperate with the DHR and other agencies involved in carrying out the terms of the stipulation. Finally, the DHR promised to dismiss the petition if the parents fulfilled their part of the contract.

Judge Donald R. Fretz heard the matter in a three-hour hearing on June 18, 1982. The DHR was represented by a deputy county counsel, both parents were represented by a deputy public defender, and the minor was represented by a deputy district attorney.

Judge Fretz ruled from the bench at the conclusion of the hearing. He found the allegations of the petition were true and ordered that David C. be freed from the custody and control of his parents.

After judgment was entered, appellants moved the court for an order staying enforcement of the judgment pending appeal so they could continue visiting David. The hearing was held on November 24, 1982, and the motion was denied.

FACTS[2]

Gloria Y., the mother of David C., was physically and sexually abused as a child by her alcoholic father. In December 1972, she was determined to be eligible for aid to the totally disabled due to mental problems. She was hospitalized in the psychiatric ward of Merced General Hospital for three days in April 1973 when she was pregnant and appeared withdrawn and depressed. In June 1973, she began to live with Ismael C. who had known her since she was a child. In August 1973, she gave birth to a child, Bobby, who is not the son of Ismael C. Gloria put Bobby in foster care briefly and took him back. When he was six weeks old, he was hospitalized because Gloria Y. had failed to properly dilute his formula. The DHR filed a petition to have Bobby declared a dependent child and the petition was denied. Gloria subsequently relinquished Bobby for adoption.

David C. was born on July 11, 1975, when Gloria Y. was 23 and Ismael C. was 45. The DHR began monitoring the family when David C. was born and the social workers became concerned that Gloria Y. did not hold David C. as much as they thought proper. When David C. was 11 months old, a social worker observed that Gloria Y., who was then 5 months pregnant, seemed depressed and disturbed. When David C. was 13 months old, he was hospitalized for 8 days and treated for malnutrition.

In September 1976, David C. was made a dependent child and put in the custody of DHR. The following month Gloria Y. gave birth to a daughter, Elizabeth. David C. spent two months with one aunt, six months with another aunt, and later was placed in the Baker foster home. His parents visited him in the foster home but did not keep a regular schedule. After dependency was continued in September 1977, the parents visited weekly for two to three hours a week for about two months, then from November through February, the parents missed approximately half of the scheduled weekly visits. After the parents missed their scheduled overnight visits, they were counseled regarding the necessity of keeping the visitation schedule. Overnight visits were again planned for one a week from February to September. The visits occurred about one-third of the time.

The parents obtained counseling from Dr. Wesley Fielding who appeared at David C.'s annual review in 1978. Dr. Fielding stated that further therapy

---

[2]The facts are derived from the court report and supplemental court report prepared by Mark Bettencourt, a social worker. The trial court took judicial notice of these reports. In addition, the facts are obtained from a 30-page report by Dr. Phillip Hamm, a psychologist, which was received into evidence. Lastly, the facts are derived from the testimony at the hearing conducted on June 18, 1982. At this hearing, Mark Bettencourt, Dr. Phillip Hamm, and Eric Oxelson, a clinical social worker, testified on behalf of DHR. Four friends and relatives testified for the parents. David and his parents did not testify. There is no indication that the trial court conducted an in-chambers discussion with the minor.

for the parents would be unproductive, as they could not be made into a loving, caring family and had reached the highest level of functioning as parents that they could. Dr. Fielding believed that David would survive but not thrive in his parents' care and recommended returning David to their care.

David C. was returned home and stayed there until July 16, 1979, just after his fourth birthday. Gloria and Ismael had been fighting and Gloria had left for a month. David reacted by defecating on the floor and smearing feces, refusing to obey his parents, and refusing to eat. His parents told their social worker they could not handle David and he was removed from the home. When David was returned to his parents in September 1978, he weighed 26 pounds. When he was removed from his parents' home nine months later, he still weighed twenty-six pounds. In the succeeding eight months while David was in foster care, he gained a pound a month.

David was placed in the Cico foster home and did very well there. The foster mother observed when he arrived that David was emotionally unresponsive, resisted learning, and would not eat unless forced to do so.

In November 1980, the parents began counseling with Dr. Marie Schraeder. Their visits with David were increased. The social workers, the foster mother, and Dr. Hamm, who had evaluated the family in 1979 and 1980, agreed that David C. was improving as a result of Mrs. Cico's care and the visits from his parents. David C. began to show a stronger attachment to his parents at this time.

In June 1981, Dr. Schraeder moved out of state and the parents refused further counseling. The foster mother had been weighing David before and after each home visit with his parents and found a weight loss after each visit. In August 1981, Gloria told a social worker that she had been having problems with David and she did not want him returned home. The DHR decided to terminate their five-year effort at returning David to his parents. The parents were notified of this decision and visits were terminated on August 10, 1981. The petition in this action was filed on October 9, 1981.

During the six-month continuance in this case, the parents had regular visitation, starting with visits in the DHR office and progressing to weekend visits in the home. David was now in the Stevenson foster home. His foster mother observed that after visits at home David became aggressive toward another foster child. David's kindergarten teacher observed that after home visits David became more aggressive and acted like a baby. David lost four pounds during a ten-day visit at home in April 1982. Throughout this time,

David's sister, Elizabeth, remained at home and the DHR monitored the care of Elizabeth.

According to the DHR, appellants did not successfully complete counseling in that they failed to fully cooperate and bring David with them as promised. At the termination hearing, the focus was initially on whether the parents had complied with the stipulation and, therefore, the petition should be dismissed. The first witness, Eric Oxelson, testified that he had met with the parents 16 times, but they had not successfully completed the program because they had not focused on their parenting problems. Mr. Oxelson could not remember if the DHR had contacted him prior to his counseling sessions with the parents. Mr. Oxelson testified that the parents met all of the appointments he had scheduled or that were rescheduled. "They didn't keep every appointment, but there was another one made in its place." The court asked if Mr. Oxelson had focused on their skills as parents. Mr. Oxelson replied, "No." Mr. Oxelson stated that they talked about why the parents were there and what they wanted out of it. "We talked of those things they were willing to discuss." At no time did they ever discuss the parents' skills as parents. For a couple of sessions, the counselor and the parents dealt with the relationship of Gloria and Ismael. Gloria and Ismael spent a great deal of time during the counseling sessions discussing the difficulty they were having with the DHR. Although Mr. Oxelson could have scheduled more appointments, he did not do so. Mr. Oxelson did not tell the parents that it was necessary they discuss certain topics or they would be failing in the objective.

The court expressed its frustration at the lack of focus in the counseling sessions with the parents. The court noted that Mr. Oxelson spent counseling time listening to the parents saying the same thing each time about their feelings with regard to the DHR and not dealing with the subject the parents were supposed to be there for. The court noted that it sounded like a waste of time. The court went on, "If you see yourself only as a psychotherapist who's supposed to listen to a couple of people who don't know what they're doing anyway, and somehow you expect them to correct themselves and to stay on a track that they don't even know exists, then you've got the wrong person in therapy, it seems to me, or they're at the wrong place." After further venting its frustration, the trial court wanted to know what it was that Mr. Oxelson did to try to help the parents. Mr. Oxelson was unable to articulate a response.

The court asked Mr. Oxelson what his understanding was as to why the parents were there. Mr. Oxelson stated that initially his feeling was that Gloria was there asking for some assistance in dealing with her anxiety in terms of what she was going through. "She wanted some support and some-

one to listen to." Later, Mr. Oxelson learned the parents were coming in because the stipulation required they do so in order to have a chance of getting their child back.

Dr. Phillip Hamm testified that he had evaluated the family four times. He labeled both parents as exhibiting three personality disorders: paranoid personality disorder, passive aggressive personality disorder, and adjustment disorder with mixed disturbance of emotion and conduct. Dr. Hamm also stated that Gloria showed residual schizophrenic disorder and social phobia. Dr. Hamm found that David showed a reactive disorder of infancy, adjustment disorder with anxiety and depression, and a problem with visual perception and visual-motor coordination delay. He described David as emotionally immature, anxious and depressed. He said David was anxious and depressed because of the court proceedings and he wanted to live with his parents. He found that David had problems making attachments to other people.

Dr. Hamm testified that if David were returned to his parents they would probably shift their hostility from the DHR to David. He predicted that if David returned home he would be seriously troubled as an adolescent and he would never recover from his emotional problems. He testified that Gloria became too easily angered but had controlled this and lost her emotional spontaneity. Dr. Hamm testified that the parents were so in need of their own problems being taken care of that they could not focus on anything but themselves.

Dr. Hamm stated that in his opinion the parents had not successfully completed counseling but that they might be able to complete some of the "minimal" requirements in the future. He felt this would require sessions once or twice a week. He testified the parents would probably go to counseling sessions if enough pressure was brought to bear but concluded this would require a lot of surveillance and supervision.

Mark Bettencourt, a social worker employed by the DHR, testified the parents attended parenting classes but that Ismael did not seem to understand the purpose of the classes and Gloria did not actively participate in them. He did not know if the teacher had made them aware of the fact that she did not think they were successfully completing the classes.

Although present in the courtroom, the county did not call the DHR case worker who dealt directly with the family or any of David's foster mothers.

The deputy public defender called two family friends and two relatives to testify that Ismael and Gloria were good parents and that David wanted to live with them.

Counsel for the parents argued that the parents had attended the counseling sessions and the parenting sessions and that they had complied with the stipulation. Counsel noted that the guidance provided by Mr. Oxelson in terms of what they were supposed to talk about was minimal at best and "apparently totally lacking at some times." Noting that the parents did not have a great deal of education, counsel stated that the parents felt they had successfully completed all that was asked of them. Counsel also pointed out that the visits as outlined in the stipulation were made and that the parents initiated those visits in the proper way. It was parents' counsel's position that the parents had successfully completed all of the conditions outlined in the stipulation agreement and that, therefore, the petition should be dismissed.

The court then allowed David's father, Ismael, to make a brief statement. He stated that he and his wife loved their son and that their son loved them. He wanted his son to be returned home again. Ismael continued into areas that would be considered as giving testimony; therefore, the court refused to allow Ismael to continue in this manner.

The court ruled from the bench. "Now, there's no sense kidding ourselves. *We either do one of two things. We either send David home or we do the 232 and take the child away and free him from parental control.*" (Italics added.) The court noted that there was a communication gap. "And it's the same gap that causes there to be a problem in the first place. The same inability to recognize the problems there with David. The same inability to correct those problems [is] the very thing that causes people to be unable to communicate." The court felt the parents had not been able to see the problems that David was having.

The court recognized that the parents loved David and understood why David would want to go home. Furthermore, the court recognized that David and his parents had established a relationship. However, the court stated that David had been having problems from the time he was born and the problems persisted. Concluding, the court stated: "And I'm sorry to say it, but I'm convinced almost beyond a reasonable doubt, certainly by clear and convincing proof, in this case, *that David should not go home.* And that makes me [sad]. And it makes me unhappy I have to be the Judge who makes that decision. I don't like it. . . . [¶] It's rather because of the set of circumstances that aren't even within your control. It's not your fault. There is a reason. But it isn't a matter of fault. I have no doubt but what you two are good people and good parents to the daughter who lives at home. It's just that the relationship with the son is different. And it's because of that that the Court feels from all of the evidence that we've got, that the decision has to be made in this case to grant the Petition, the 232 and free the child

from parental control." (Italics added.) The court noted its frustration with Eric Oxelson: "From what I heard, he didn't do what I would expect somebody who was trying to relate to these people and was trying to help would do. [¶] It may well be that he did what's required by the rules and the regulations of his job. But I didn't see or hear of an attempt to relate to these people. I saw only a kind of a thing that cause[d] me, at any rate, to obtain an impression from him of a kind of a person who was waiting to be told by these people what their problem was so that they might then mutually agree upon procedure by which it could be resolved. And I think he was in the wrong place or they were in the wrong place for the kind of counseling as I see them as needing."

## DISCUSSION

### I

 Appellants contend there is no evidence that the parents received proper notice as required by section 235. Not so. Section 235 provides that the father and mother of the minor shall be notified of the proceedings by service of a citation advising them they may appear at the time and place stated in the citation.

First, there is no indication that appellants' counsel at trial ever objected to a lack of service of citation. Second, after appellants first brought up this issue in their opening brief, respondent, DHR, filed a proof of service of the required citation on August 11, 1983. The document shows that the parties were served with the proper citation on October 20, 1981. Hence, appellants cannot complain in this regard.

### II

 Appellants next contend that the notice given was inadequate and a violation of due process. Appellants argue the petition recites only the conclusionary words of section 232, subdivisions (a)(2) and (a)(7), and Welfare and Institutions Code section 300. They contend there are no specific facts specifying how David was being harmed at the time the petition was filed in 1981. This is true. The only specific fact alleged in the petition was that David was declared a dependent child of the juvenile court in 1975 (sic)[3] because he was suffering from chronic malnutrition. However, we note that appellants failed to object to this inadequacy below and we believe any defect in the notice in the rather "skimpy" petition was cured for the following reasons.

---

[3]David was declared a dependent child of the court in *1976*.

Section 233 provides that upon a filing of a section 232 petition, the appropriate county agency shall investigate the circumstances and file a report with the court. In this case, a court report and a supplemental court report were filed. The reports are quite detailed and, in our opinion, adequately comply with due process notice considerations. ██ Case law provides that in a proceeding to terminate parental custody and control, due process requires that the parents should receive a copy of the report. (*In re George G.* (1977) 68 Cal.App.3d 146, 156-157 [137 Cal.Rptr. 201].)

██ There has been no assertion by appellants that they or their attorneys did not receive copies of these reports which would have assisted them in knowing the factual allegations and preparing for their defense in the action. The initial court report was filed November 19, 1981. The supplemental court report (prepared after the stipulated continuance and counseling period had ended) was filed on June 16, 1982. Clearly, these reports provided a myriad of factual details to place appellants on notice of the DHR's position.

### III

██ Appellants next contend that the failure of the judge to articulate factual findings upon which he based his order "constitutes a deprivation of due process." Citing *In re Rose G.* (1976) 57 Cal.App.3d 406 [129 Cal.Rptr. 338], appellants assert that findings of fact and conclusions of law are required in section 232 proceedings if they are requested. We do not see the relevancy of *In re Rose G.* since appellants did not request findings of fact and conclusions of law in the case before us. Code of Civil Procedure section 632 provides in pertinent part that "written findings of fact and conclusions of law shall not be required." Moreover, procedures for requesting a statement of decision were not pursued by any of the parties in the instant case.

### IV

██ Appellants next contend that an express finding that it is in the best interests of the child to be freed from his parents' custody and control is required by sections 232.5 and 4600. We agree.

Section 4600, subdivision (c), provides in pertinent part that "Before the court makes any order awarding custody to a person or persons other than a parent, without the consent of the parents, *it must make a finding that an award of custody to a parent would be detrimental to the child and the award to a nonparent is required to serve the best interests of the child.*" (Italics added.) Section 232.5 provided at the time relevant to this appeal

that "The provisions of this chapter shall be liberally construed to serve and protect the *interests and welfare of the child.*" (Italics added.) This latter code section has been interpreted to mean that the court is required to "consider" the best interests and welfare of the child before reaching its conclusion in a section 232 proceeding. (*In re Rose G., supra,* 57 Cal.App.3d 406, 415; *In re Neal* (1968) 265 Cal.App.2d 482, 490 [71 Cal.Rptr. 300].)

The California Supreme Court in *In re B. G.* (1974) 11 Cal.3d 679 [114 Cal.Rptr. 444, 523 P.2d 244] held that section 4600, relating to custody of children, governs custody awards in juvenile court proceedings. (*In re B. G., supra,* at pp. 696-699.) The court imposed its express "detriment" finding uniformly in all types of custody proceedings, pointing out that "California has at least eight separate proceedings in which custody questions can be litigated." (*Id.,* at p. 696; see also *In re Rose G., supra,* 57 Cal.App.3d at p. 417.)[4] Thus, before a court may award custody of a child to a nonparent, it must render a finding that an award to a parent would be " 'detrimental to the child' " *and* that such an award to a nonparent was " 'required to serve the best interests of the child.' " (*In re B. G., supra,* at p. 695; see also *In re Angelia P.* (1981) 28 Cal.3d 908, 928-929 [171 Cal.Rptr. 637, 623 P.2d 198]; *In re Carmaleta B.* (1978) 21 Cal.3d 482, 496 [146 Cal.Rptr. 623, 579 P.2d 514] [which used the language "least detrimental alternative"].) This finding has become known as a "B. G." or "4600" finding. (*In re Rose G., supra,* at p. 417.) In the instant case, the court did not make such a finding. The trial court clearly erred in failing to make the required findings.[5] Moreover, while a specific form is not necessarily required, we conclude it cannot be said that the remarks of the trial judge here constituted "substantial compliance." (See, e.g., *In re Richard E.* (1978) 21 Cal.3d 349, 356-357 [146 Cal.Rptr. 604, 579 P.2d 495].)

---

[4]California has three major bodies of law concerned with the child custody decision: the law of guardianship of the person, the law of juvenile dependency, and what may be termed general custody law applied most frequently in marriage dissolution proceedings. Each of these areas of law is governed by a separate set of statutory provisions and each is administered in a different department of the superior courts. In addition to these major actions, there are several other custody remedies, including a special cause of action for exclusive custody without marriage dissolution, suits in equity to determine custody, proceedings to terminate parental rights, adoption proceedings, and habeas corpus actions. "Combining all of these approaches, there are at least eight different legal remedies in California that focus on the same question: Where and with whom should a child live when something has occurred to disrupt family unity or balance?" (Fn. omitted.) (Bodenheimer, *The Multiplicity of Child Custody Proceedings—Problems of California Law* (1971) 23 Stan.L.Rev. 703, 705, cited in *In re B. G., supra,* 11 Cal.3d 679, 696.)

[5]We further note that section 232, subdivision (a)(7), at the time relevant to this appeal provided that the court must find by clear and convincing evidence that "return of the child to his parent or parents would be *detrimental* to the child." (Italics added.)

## V

 Appellants next contend that DHR's failure to file a declaration under section 5158 voids the instant proceedings.[6]

DHR contends that section 232 is not a custody proceeding and, therefore, no declaration need be filed under the Uniform Child Custody Jurisdiction Act. Under the California Supreme Court's interpretation of custody proceedings, we find this contention without merit. (See fn. 4, *ante*; *In re B. G.*, *supra*, 11 Cal.3d 679, 696.) However, we find no authority specifically requiring that a filing under the Uniform Child Custody Jurisdiction Act need be made in a termination of parental rights proceeding. Nonetheless, even if DHR were required to file a declaration pursuant to the Uniform Child Custody Jurisdiction Act, we doubt the error would be prejudicial. The psychiatric reports and the court report indicated in detailed form where David C. had been living during the course of his entire life. Thus, if error were indeed committed in this regard, it would be harmless.

## VI

 Appellants next contend that the minor's juvenile file was improperly admitted at trial. DHR contends they merely requested the court take judicial notice of the prior orders as they related to the allegations in the petition. DHR contends, "There is no reason to believe the Court did anything other than what the law required." However, from a careful reading of the record, we agree with appellants that the court did take judicial notice of the entire juvenile court file.

The deputy county counsel requested that the court "take judicial notice of *one of its own files which is the David [C.] . . . juvenile file, . . .*" (Italics added.) Indeed, after the court took judicial notice of the court report and supplemental court report, the court stated, "Now, the other thing you've asked me to take judicial notice of is *another file.*" (Italics added.) County counsel responded, "Correct." The court replied, "I want to do that, too." Thus, from this colloquy, it is apparent that the court was taking judicial notice of the entire juvenile court file.

In a section 232 proceeding, the judge may take judicial notice of facts asserted in findings and orders in a prior juvenile court proceeding but

---

[6]Section 5158, subdivision (1), provides in pertinent part that in a custody proceeding every party in his first pleading or in an affidavit attached to that pleading shall give information under oath as to the child's present address, the places where the child has lived within the last five years, and the names and present addresses of the persons with whom the child has lived during that period.

cannot take judicial notice of the entire juvenile court file. (*In re Tanya F.* (1980) 111 Cal.App.3d 436, 440 [168 Cal.Rptr. 713].) ■ The law in this area has been summarized by Bernard S. Jefferson as follows: "What is meant by taking judicial notice of court records? There exists a mistaken notion that this means taking judicial notice of the existence of facts asserted in *every document* of a court file, including *pleadings* and *affidavits*. However, a court *cannot* take judicial notice of *hearsay allegations* as being true, just because they are part of a court record or file. A court may take judicial notice of the *existence* of each document in a court file, but can only take judicial notice of the *truth* of facts asserted in documents such as orders, findings of fact and conclusions of law, and judgments.

"The trial judge should always be careful to *specify exactly* the document or portion of a document contained in a court file of which he is taking judicial notice. Also, counsel should be required to state, with *like specificity,* the exact document or portion of a document from a court file or record, when requesting the court to take judicial notice of a court record." (2 Jefferson, Cal. Evidence Benchbook (2d ed. 1982) § 47.2, p. 1757.)

■ Appellants point out that the minor's juvenile file included a medical report prepared in 1976 and a number of reports by various social workers who dealt with this family from 1975 until the date of the hearing. Most of the people who prepared these reports were not present in court.[7] The trial court erred in taking judicial notice of the entire juvenile court file.

## VII

■ Appellants' next contend that the court appointed improper counsel for the minor. The court appointed Deputy District Attorney David Bultena to represent the minor, David C. Mr. Bultena signed the stipulation in 1981 and represented the minor at trial.

Section 237.5, subdivision (a), provides that at the beginning of a section 232 proceeding the court "shall consider whether the interests of the minor require the appointment of counsel. If the court finds that the interests of the minor do require such protection, the court shall appoint counsel to represent the minor." Subdivision (c) provides that "The *public defender* or *private counsel may* be appointed as counsel pursuant to this section." (Italics added.)

---

[7]Interestingly, we note that while the trial court stated it took judicial notice of the juvenile court file, we find nothing in the record to indicate the juvenile court file was filed or lodged before the court or that the trial court in any manner had the file before it or considered it in making its decision.

Even though this statute by the permissive "may" does not specifically preclude the appointment of the district attorney and we find no cases to guide us on this issue, we believe a clear reading of the statute indicates that if the trial court exercises its discretion and appoints counsel for a minor, the most *appropriate* counsel might be the public defender or private counsel. Some section 232 situations might eventually lead into criminal prosecution against parents and the court should be aware of a possible conflict of interest.

While we are not prepared to hold that the court erred in appointing the deputy district attorney in the instant case, we suggest in the future private counsel might be a more appropriate choice to represent the minor in a situation where the parents are represented by the public defender.

## VIII

 ██ Appellants next contend they lacked effective assistance of counsel.[8]

Appellants, relying on *In re Angelia P., supra,* 28 Cal.3d 908, 926-927, contend the *Pope* standard applies in the instant proceedings. (See *People* v. *Pope* (1979) 23 Cal.3d 412 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].) However, a careful reading of *In re Angelia P.* does not in any way indicate whether *Pope* is the appropriate standard to apply in the case before us. Certainly, as counsel was appointed for the indigent parents in the instant case, the parents had a right to have effective assistance of counsel. After a thorough review of this record, it can be demonstrated that counsel for appellants made a number of omissions significantly affecting appellants' rights.[9]

Appellants also contend that David C. was represented by inadequate counsel. Appellants correctly point out that parents in a custody proceeding have standing to assert the minor's right to adequate counsel. (*In re Ann S.* (1982) 137 Cal.App.3d 148 [188 Cal.Rptr. 1].)

---

[8]The United States Supreme Court has held that due process requires the appointment of counsel for parents in some but not all termination proceedings. (*Lassiter* v. *Department of Social Services* (1981) 452 U.S. 18 [68 L.Ed.2d 640, 101 S.Ct. 2153].) The decision whether due process calls for the appointment of counsel is to be answered in the first instance by the trial court, subject to appellate review. (*Id.,* at pp. 24-32 [68 L.Ed.2d at pp. 647-652].)

[9]For example: Failure to request separate counsel for each of the parents; failure to object to adequate notice; failure to object to the court taking judicial notice of the entire juvenile court file; failure to object to the appointment of the deputy district attorney to represent David; failure to argue that DHR had not met its burden of proof on either the section 232, subdivision (a)(2) or (7), theory; failure to stress the proper findings to be made by the trial court and to object when the court did not make those findings; and failure to request findings of fact.

Counsel for David presented no witnesses, engaged in cursory cross-examination and only briefly argued to the court. Appellants also argue that there is nothing in the record to show that the deputy district attorney ever met his client or spoke to the parents or sister or was aware of the minor's wishes. Appellants assert that counsel did not show any concern for the minor's feelings for his natural family and the impact that termination would have on the minor.

As we are reversing on other grounds, we find it unnecessary to rule on the inadequacy-of-counsel contentions. Moreover, we do not have a proper record before us to rule on this issue.

Upon request of the parties at oral argument, we nonetheless find it necessary to address the issue of the proper role of an attorney appointed to represent a minor in a section 232 or other custody proceeding. Counsel for the minor on appeal stressed his confusion over whether counsel for a minor should assume the role of an advocate and merely argue for the child's stated desires (assuming the child is old enough to express himself), or whether counsel should argue for the best interests of the child, disregarding the child's preferences. It has been argued that attorneys are generally not trained psychologists or social workers and are not necessarily equipped to make decisions as to what the best interests of the child are. Counsel for the minor seemed to imply that counsel would, therefore, necessarily have to rely on the reports and assessments of the experts hired by the counties. Counsel went so far as to suggest that counsel for the minor would not even have to speak with the child, his family or his natural and foster parents during his representation. Counsel for the minor on appeal mentioned he had not had contact with David and did not know whether trial counsel did, or *even should have,* met with David during the litigation period below.

Section 237.5 requires the court to consider whether "the interests of the minor" require appointment of counsel. Obviously, both DHR and the parents may have separate interests to protect in these proceedings even though all parties purport to consider the best interests of the child. Thus, when counsel for the minor is appointed pursuant to section 237.5, it is important that counsel be truly independent in order to protect *the child's interests.* Merely agreeing with the agency's assessments without conferring with the family and child involved does not guarantee independent counsel for the minor, nor does it do anything to foster the minor's best interests. Certainly, counsel for the minor must take into consideration the child's wishes when determining what the child's best interests are. This does not mean that, after independent consultation, reflection and study, counsel for the minor cannot urge that the child's best interests would be fostered by termination of parental rights, contrary to the stated desires of the child.

The role of counsel for the child is not merely to act as a mouthpiece for the minor child. But neither is counsel to act as a mouthpiece for the governmental agency concerned. The whole purpose behind section 237.5 is to provide *independent counsel,* when necessary, for the protection of the minor's interests. We suggest, at a bare minimum, counsel for the minor should thoroughly review the record, interview the child when appropriate, considering such factors as health and age, and consider some type of contact with the child's foster and natural parents in order to make an informed judgment on behalf of his client. Independent medical and psychological assessment might be necessary in appropriate cases. Only by such endeavor can the court be assured that counsel for the minor is truly independent and is informed enough to represent the child's best interests.

## IX

Appellants' last contention on appeal is that DHR failed to show by clear and convincing evidence that this is an extreme case where removal is essential to avert harm to the child and is the least detrimental alternative. As discussed *supra,* the court is required to find that termination is in the best interests of the child and is the least detrimental alternative. (*In re Carmaleta B., supra,* 21 Cal.3d 482; *In re B. G., supra,* 11 Cal.3d 679.) The trial court in the instant case failed to make such a finding. As it is necessary to reverse the judgment on this and other grounds, it is unnecessary that we rule on the sufficiency of the evidence at this time. However, we find it necessary to make certain observations for future guidance.

 The California Supreme Court has held that parenting is a fundamental right and accordingly has been disturbed only in extreme cases of persons acting in a fashion incompatible with parenthood. (*In re Carmaleta B., supra,* at p. 489.) The relationship of a natural parent and his child is a vital human relationship which has far-reaching implications for the growth and development of the child. (*Ibid.*) Thus, the involuntary termination of that relationship by state action must be viewed as a " 'drastic remedy which should be resorted to only in extreme cases of neglect or abandonment.' " (*Ibid.*) Lastly, it has been held that findings under any subdivision of section 232 must be made on the basis of *"clear and convincing evidence."* (*In re Angelia P., supra,* 28 Cal.3d 908, 919; see also *Santosky* v. *Kramer* (1982) 455 U.S. 745, 759 [71 L.Ed.2d 599, 610, 102 S.Ct. 1388].) "Clear and convincing" evidence requires a finding of high probability. The evidence must be so clear as to leave no substantial doubt. It must be sufficiently strong to command the unhesitating assent of every reasonable mind. (*Ibid.*; see also *Sheehan* v. *Sullivan* (1899) 126 Cal. 189, 193 [58 P. 543]; *In re Terry D.* (1978) 83 Cal.App.3d 890, 899 [148 Cal.Rptr. 221].)

We note that it is not entirely clear to what degree DHR relied on section 232, subdivision (a)(2), in the instant proceedings. Nor is it clear if the trial court based its decision on this subdivision. Subdivision (a)(2), at the time relevant to this appeal, provided that minors are entitled to be free from parental custody and control if they have been *cruelly treated* or *neglected* by their parents: "Who has been cruelly treated or neglected by either or both of his parents, if such person has been a dependent child of the juvenile court, and such parent or parents have been deprived of his custody for the period of one year prior to the filing of a petition praying that he be declared free from the custody and control of such cruel or neglectful parent or parents."

The only reference in the petition using the terms of subdivision (a)(2) is paragraph V, which states that David was declared a dependent child of the court in 1975 (*sic*) because his home was unfit by reason of *"neglect* by his parent, in that the minor was suffering from chronic malnutrition." (Italics added.)

At trial, county counsel referred to section 232, subdivision (a)(2), briefly before he rested his case. He indicated to the court there was a small amount of confusion as to what was found at the Welfare and Institutions Code section 300 dependency proceeding. County counsel stated he believed the "formal" order found Welfare and Institutions Code section 300, subdivisions (a) (in need of proper and effective parental care or control) *and* (d) (neglect, cruelty, depravity, or physical abuse), violations. County counsel noted the minute order only found a Welfare and Institutions Code section 300, subdivision (a), violation. Despite this confusion, county counsel pointed out to the court that DHR was still urging the "232(a)(2)." Counsel wanted to "alert the Court to that difficulty." Thus, there is some problem in the instant case with reliance on "neglect" pursuant to section 232, subdivision (a)(2).

If the court in any way based its decision on section 232, subdivision (a)(2), then it is doubtful whether it was shown by *clear and convincing evidence* that the parents cruelly treated or neglected David in the instant case. Rather, as can be seen from the facts, *supra,* the experts focused their attention on the educational, emotional, and psychological handicaps of the parents and the family in general.

Paragraph VII of the petition is a paraphrased version of section 232, subdivision (a)(7). Subdivision (a)(7), at the time relevant to this appeal, read in pertinent part as follows: "Who has been cared for in one or more foster homes, . . . under the supervision of the juvenile court, the county welfare department or other public or private licensed child-placing agency

for two or more consecutive years, providing that the court finds by *clear and convincing evidence* that return of the child to his parent or parents would be detrimental to the child and that the parent or parents have failed during such period, and are likely to fail in the future, to do the following:

"(i) Provide a home for the child;

"(ii) Provide care and control for the child; and

"(iii) Maintain an adequate parental relationship with the child." (Italics added.)

Thus, the court in the instant case needed to find by *clear and convincing proof* that the parents were *unlikely in the future* to provide the proper care for and establish an adequate parental relationship with David. As noted above, it is not necessary to rule whether there was sufficient evidence to support this theory, but we nonetheless note that DHR's primary witness, Dr. Hamm, pointed out that if the parents went through counseling sessions once or twice a week, in a few years they might be able to complete some of the minimal requirements of "successfully completing counseling or parenting sessions." Moreover, David had established a relationship with his parents and, in fact, desired to return home. Indeed, Dr. Hamm cautioned that David would need counseling in the event of termination of parental rights.

In sum, for future guidance, we point out that it is doubtful whether DHR met its substantial burden on either the section 232, subdivision (a)(2) or (a)(7), theory. The evidence must be so clear as to leave no substantial doubt. (*In re Angelia P., supra,* 28 Cal.3d 908, 919.)

## X

 In conclusion, we hold that the judgment below must be reversed. Not only is it doubtful whether DHR met its burden on the evidence, numerous shortcomings, though not prejudicial in and of themselves, combined to render the proceedings inadequate in protecting the fundamental rights of Ismael, Gloria and David. The notice given in the petition was cursory at best. The stipulation was inadequate in that it failed to define for these parents, who were uneducated and not well versed in the English language, exactly what was meant by "successfully" completing parenting and counseling sessions. Counsel for the parents failed to object to many errors and failed to request findings. Counsel for David presented no witnesses, engaged in cursory cross-examination and only briefly argued to the court. Lastly, even the court acknowledged that Mr. Oxelson, the parents'

social worker, failed to focus the parents on their parenting skills in their counseling sessions.

Combined with the above shortcomings is the fact that the trial court erroneously believed if the petition were not granted David would go home. "We either do one of two things. We either send David home or we do the 232 and take the child away and free him from parental control." On the contrary, David would still be a dependent child if the section 232 petition were not granted and would remain so unless actions were set in motion to terminate dependency. The judge ruled that David should "not go home." This was *not* the issue before the court and counsel present did not point this out to the court. Naturally, if the section 232 petition were not granted, there would at least be the *possibility* that sometime in the future David might be reunited with his parents, but this would not automatically mean there would be immediate, permanent reunification between David and his natural parents. The issue before the court in a section 232 proceeding is whether the court should *permanently sever all parental bonds.*[10] As has been previously stated, parenting is a fundamental right and the involuntary termination of a parent-child relationship should be resorted to only in extreme cases of neglect or abandonment. (*In re Carmaleta B., supra,* 21 Cal.3d 482, 489.)

Finally, and significantly, the court erred by failing to make the required findings of "least detrimental alternative" and "best interests of the child." (*In re Angelia P., supra,* 28 Cal.3d 908, 928-929; *In re Carmaleta B., supra,* 21 Cal.3d 482, 496; *In re B. G., supra,* 11 Cal.3d 679, 695; *In re Rose G., supra,* 57 Cal.App.3d 406, 415-417.)

Accordingly, the judgment is reversed.

Franson, Acting P. J., and Hanson (P. D.), J., concurred.

---

[10]Under Welfare and Institutions Code section 300, subdivisions (a) through (d), a parent may lose custody of a child on a "non-conclusive basis." (*In re Norma M.* (1975) 53 Cal.App.3d 344, 346 [125 Cal.Rptr. 721].) However, the loss threatened by a section 232 proceeding is of far graver consequence. A judgment against the parent permanently severs the parent-child relationship.