[No. F014323. Fifth Dist. June 28, 1991.]

In re RICHARD C. et al., Persons Coming Under the Juvenile Court Law.
STANISLAUS COUNTY DEPARTMENT OF HUMAN SERVICES,
Plaintiff and Respondent, v.
BARBARA D., Defendant and Appellant.

**COUNSEL**

Howard M. Hoffman, under appointment by the Court of Appeal, for Defendant and Appellant.

Michael H. Krausnick, County Counsel, and Harry P. Drabkin, Deputy County Counsel, for Plaintiff and Respondent.

Donna L. Hall, under appointment by the Court of Appeal, for Minors.

**OPINION**

**VARTABEDIAN, J.**—Barbara D. appeals from a juvenile court order instituting guardianship of two of her children, Richard C. and Jennifer C. The court issued letters of guardianship upon its finding guardianship as the appropriate permanent plan in the place of adoption. An earlier Civil Code section 232 petition for termination of parental rights brought by the Stanislaus County Department of Human Services (the Department) had been denied by the superior court. Barbara principally claims the juvenile court

erroneously placed the burden of proof upon her under Welfare and Institutions Code[1] section 366.3 at the time it appointed guardians for the minors. We disagree, affirming the appealed order.

### FACTS AND PROCEEDINGS

Richard was born on May 11, 1988, six weeks prematurely. Barbara had not obtained prenatal care and tested positive for methamphetamine and cocaine at the time of Richard's birth. Richard also tested positive for methamphetamine. Richard was taken into protective custody on June 2, 1988.

A social worker went to Barbara's home on June 2, 1988. Barbara was not home; an older son, Ronald,[2] and Jennifer had been left with a baby sitter, Dave Bonilla. Bonilla said Barbara was expected to return in one-half hour. When she had not returned in one hour, Ronald and Jennifer were also taken into protective custody.

On June 6, 1988, a petition pursuant to section 300, subdivisions (b) and (d), was filed alleging that Richard C. had no parent or guardian actually exercising care or control of him. A similar petition pursuant to section 300, subdivisions (a), (b) and (d) was filed regarding Jennifer on that same day.

Both Richard and Jennifer were detained following a hearing on June 7, 1988. On June 14, 1988, Barbara entered a plea of no contest to the amended petition for both children.

By way of background, Barbara had married Randall D. upon becoming pregnant with Ronald. They divorced because of fights, caused in part, according to Randall, by Barbara's drug use. Barbara was not sure who fathered Jennifer, but thought perhaps it was Chris C., with whom Barbara had a one-night relationship after she had consumed too much alcohol at a Valentine's Day party. Richard's father is Richard W., with whom Barbara lived for about a month. Richard W. reported that Barbara's drug use and violence were a problem.

Barbara started drinking alcohol when she was in junior high school and using "crank" (methamphetamine) when she was about 17. Barbara admitted that she had sold crank when she was married to Randall D. because he would not give her enough money for household expenses. She said she had

---

[1]Future code references are to the Welfare and Institutions Code unless otherwise noted.

[2]In addition to Jennifer and Richard, Barbara also had an older son, Ronald D., living with her at that time. On July 15, 1988, Ronald was placed with his father, Randall D.; Ronald is not involved in this appeal.

not used drugs since Richard was born and that having the children taken away had caused her to "wake up."

Prior to the minors' detention, Barbara and the children lived in a poorly maintained, sparsely furnished rental house located in rural Turlock. Another child and two other adults also lived in the home. When interviewed by the Department, Barbara said she had lived in the home for eight or nine months; she expected to be evicted for nonpayment of rent. The bedroom in which Barbara and Jennifer stayed was dirty, with the mattress on the floor and no bedding. The bedroom closet door had to be padlocked to prevent theft. Barbara admitted that the house was a terrible place to live and that she and the children should have moved long ago. She described people who frequented the house as "low lifes, slimeballs," and "bad people."

Previously, Barbara had contacted the Department in October 1987 when she requested assistance with temporary housing. She and the children were provided with two nights of lodging at a local hotel. After Barbara received her aid to families with dependent children (AFDC) check, she was provided with transportation to another hotel where she rented a room for herself and her children.

The case plan for reunification included the following requirements:

"1. Locate and maintain a home that is a safe place for the minors. Provide appropriate sleeping accommodations and an adequate supply of food for the minors.

"2. Successfully complete a substance abuse counseling program which includes regular drug testing.

"3. Make herself available for a blood test for the purpose of establishing the paternity of Richard.

"4. Maintain contact with the minors through regular visits arranged by the social worker. Demonstrate appropriate parenting during visits with the minors.

"5. Cooperate with the social worker by allowing regular home visits, signing any necessary releases of information and notifying the worker promptly of any change in her situation."

The disposition hearing was held on June 28, 1988; a review hearing was set for November 14, 1988. Barbara refused to sign the notice required by

section 366.25 notifying her that her parental rights might be terminated if she was not able to resume custody "within the next six months."

Barbara's request for visitation was heard on July 28, 1988. The court ordered, "Upon showing of commencement of Reunification Plan, there should be visits every two weeks. As mother gets into the plan further, visits could be every week."

On August 4, 1988, Barbara signed a reunification contract which included the same elements previously outlined. She acknowledged that her failure to complete the terms of the agreement could result in losing her children to adoption, legal guardianship, or long-term foster care.

Barbara had missed her July visit with Richard and Jennifer, but visited them in August. Although she canceled her September visit, she kept her October visitation. As of October 20, 1988, Barbara had not attended any substance abuse counseling. A letter was sent by the social worker to reiterate to Barbara that she needed to take steps to fulfill her contract.

At the November 14, 1988, review hearing, a periodic review hearing was set for May 2, 1989.

A report was prepared for that hearing on April 12, 1989. The social worker noted that it had been 11 months since the petition was filed and that mother still had no permanent residence and had attended a total of only 2 appointments at substance abuse counseling. "It appears Ms. [D.] is unable to complete the terms of her reunification contract and there is no indication that she will be able to reunify in the near future." The social worker recommended that the children remain in placement.

Barbara had changed her residence several times since the prior hearing. She had missed four monthly visits with the children and had not completed her reunification plan. Barbara was again pregnant, experiencing a difficult pregnancy.

An addendum dated May 2, 1989, entitled "permanency planning report," noted that Barbara was making last-minute attempts by starting her substance abuse counseling in mid-April but that she had no stable residence and "[s]ince a year has almost past [*sic* ] and no substantial progress has occurred, it appears unlikely it will in the future."

Barbara was present with her counsel at the May 2 hearing. The court's minute order read:

"Reunification has not been effected in the past 6 months. There is no substantial likelihood that minor could be returned to the physical custody of parent in the next 6 months. A preponderance of the evidence shows that it would be physically and emotionally detrimental to the minor to return minor to the physical custody of a parent. A permanent plan is necessary at this time. Minor is an adoptable child. A substantial likelihood that minor can and will be adopted. Permanent plan is for adoption. Court authorizes the Agency to proceed with a 232 Petition."

The court reiterated its findings and orders at the rehearing of May 25, 1989.

On January 30, 1990, a motion for visitation was denied without prejudice.

The Civil Code section 232 hearing was held on February 28, 1990. The trial court issued its statement of decision on March 6, 1990; it denied the petition for termination of parental rights and remanded the matter back to the juvenile court.

On March 27, 1990, the Department filed an "application for modification of juvenile court order to change the permanent plan of adoption to guardianship." The Department requested that the current foster parents be given permission to pursue guardianship.

The application was heard by the juvenile court on June 1, 1990. Two psychologists testified: Dr. Steven Carmichael and Dr. Gary Zimmerman.

An updated social study showed that Barbara had given birth to her fourth child in August 1989, that she had married the father of the child in January 1990, and that they were living with her husband's mother. Barbara planned to move back to her mother's home in Lodi if she got Richard and Jennifer back.

At the hearing, Dr. Carmichael testified that visitation between Barbara and the children would not be detrimental to them. He recommended monthly visits with the prospect of more frequent visits. He did not think it would be a good idea to return them immediately to Barbara's custody because the foster home was stable and secure. He met with Barbara and the children once at his office. There was positive interaction between Jennifer and Barbara. Richard was at first frightened, but after about five minutes began interacting with his sister and his mother. By the end of the hour they were all playing a game. Carmichael noted: "This was a pleasant, positive hour." Barbara took some pictures of the children and hugged them before

saying good-by. Carmichael reported that the foster mother did not note any changes in the children's behavior after the visit. Jennifer did not wet her bed, which she sometimes did when under stress.

Carmichael did not recommend returning the children to Barbara because they were emotionally fragile and psychologically dependent upon their foster parents as their only parents. He thought returning Jennifer to her mother was a possibility "down the road." He had known Jennifer for six months and had seen positive changes in her since she had been with the current foster parents.

Dr. Zimmerman had been appointed by the court as Barbara's expert. His purpose was to evaluate Barbara's ability to parent, not to evaluate the children. He gave Barbara a number of tests and found no evidence that she lacked the ability to parent. He testified she had sufficient insight to know when to turn to others for help. In his experience, a child removed from a stable foster home placement will experience at least some short-term detriment. He did not believe that Barbara's performance as a parent would be detrimental to the children.

Barbara testified that she was employed part time by her sister. After her new marriage, she tested negative for drugs. She expressed her desire to have her children back, saying, "my kids to me are my life." Her husband was a lineman for a cable company. She did not foresee any problem with a larger family living in her mother-in-law's home. She admitted she took methamphetamine when she was pregnant with Richard, but denied knowing it had cocaine in it. She only took the methamphetamine because she needed to stay awake when Ronald was sick.

At the conclusion of the June 1, 1990, hearing, the court established guardianship as the permanent plan, modifying its previously ordered plan of adoption, and ordered that letters be issued. The court allowed Barbara to have visitation not less than once a month on condition that she be tested for controlled substances under the supervision of the Department.

## DISCUSSION

Our analysis focuses on the nature of the hearing in the juvenile court following the denial of the Civil Code section 232 petition and the burden of proof properly imposed at that hearing.

■ Barbara argues that the juvenile court should have held a hearing pursuant to section 366.2 and that reunification services should again have been offered, instead of treating the hearing as coming under section 366.3.

The Department counters that the matter simply returns to the juvenile court for consideration of another permanent plan, which in this case was guardianship. It further argues that section 366.2 has no application to this case and, although section 366.3 is not directly on point, it should be used by analogy.

In making its ruling, the court noted:

"[I]f an existing permanent plan for some reason becomes unenforceable, that does not mean that we reverse the situation and go immediately back to a placement in the family home or with necessarily reunification, although given the right circumstances, by proof to the Court's satisfaction, that it would be in the best interests of the children to do that, there is nothing that prohibits the Court from making such an order. I am not of such a state of mind at this time. I am convinced by Dr. Carmichael's statement, and even by those of Dr. Zimmerman, that it would, in fact, be detrimental to both of these children to remove them at the present time from their present setting, and there can be just no question about that. And so, therefore, we are mandated into a permanent plan, . . ."

Section 366.2 sets out the procedure to follow in status review hearings. Subdivision (e) of that section provides in part:

"The court shall proceed as follows at the review hearing: The court shall order the return of the minor to the physical custody of his or her parents or guardians unless, by a preponderance of the evidence, it finds that the return of the child would create a substantial risk of detriment to the physical or emotional well-being of the minor. The probation department shall have the burden of establishing that detriment. . . ."

However, section 366.2 must be read in conjunction with section 366, which provides that every child in foster care shall be reviewed "no less frequently than once every six months . . . until the hearing described in Section 366.25 or 366.26 is completed. . . . [¶] (b) Subsequent to the hearing periodic reviews of each child in foster care shall be conducted pursuant to the requirements of Sections 366.3 and 16503."

Section 366.3 provides in relevant part:

"If a juvenile court orders a permanent plan of adoption or legal guardianship pursuant to Section 366.25 or 366.26, the court shall retain jurisdiction over the minor until the minor is adopted or the legal guardianship is established. The status of the minor shall be reviewed every six months to ensure that the adoption or guardianship is completed as expeditiously as

possible. When the adoption of the minor has been granted, the court shall terminate its jurisdiction over the minor. The court may continue jurisdiction over the minor as a dependent minor of the juvenile court following the establishment of a legal guardianship or may terminate its dependency jurisdiction . . . .

"If the court has dismissed dependency jurisdiction following the establishment of a legal guardianship and the legal guardianship is subsequently revoked or otherwise terminated, the county department of social services or welfare department shall notify the juvenile court of this fact. . . .

". . . If the petition to terminate guardianship is granted, the juvenile court may resume dependency jurisdiction over the minor, and may order the county department of social services or welfare department to develop a new permanent plan, . . .

"Unless the parental rights of the child's parent or parents have been terminated, they shall be notified that the guardianship has been revoked or terminated and shall be entitled to participate in the new permanency planning hearing. The court shall try to place the minor in another permanent placement. At the hearing, the parents may be considered as custodians but the minor shall not be returned to the parent or parents unless they prove, by a preponderance of the evidence, that reunification is the best alternative for the minor. The court may, if it is in the interests of the minor, order that reunification services again be provided to the parent or parents."

Thus, Barbara claims that at the June 1, 1990, hearing the court should have placed the burden of proof on the Department pursuant to section 366.2 to establish substantial risk of detriment to the minors if returned; instead, the court followed the section 366.3 standard that it would not return the children to Barbara unless she showed that reunification was the best alternative for the children.

Does the superior court's sending the matter back to the juvenile court after the denial of the Civil Code section 232 petition dictate a materially different procedure than would have occurred had guardianship been the permanent plan selected by the court initially? To answer this question, we first review section 366.25 which explains how the consideration of guardianship normally arises in section 300 proceedings.

Section 366.25 provides for the juvenile court to conduct a hearing no later than 12 months after the original disposition hearing to make a determination regarding the future status of the minor. Section 366.25, subdivision (c) provides that the court must determine if the minor should be

returned to the parent (pursuant to § 366.2, subd. (e)). If the minor is not returned to the custody of a parent, the court must determine whether there is a substantial probability that the minor will be returned to the parent within six months. If so, the court sets another review hearing no more than six months later.

However, if the court determines that the minor cannot be returned to the custody of his or her parent and that there is no substantial probability that the minor will be returned within six months, the court must develop a permanent plan. (§ 366.25, subd. (d).)

If a permanent plan is necessary, subdivision (d)(1) provides that the court must determine first if it is likely that the minor can or will be adopted; if so, absent certain circumstances, it shall authorize the social services department to proceed to free the child by a Civil Code section 232 action.

Next, if the court finds that it is not likely the minor can or will be adopted, the court will order the department "to initiate or facilitate the placement of the minor in a home environment that can be reasonably expected to be stable and permanent." (§ 366.25, subd. (d)(2).) This may be accomplished by initiating legal guardianship proceedings or long-term foster care.

Section 366.25, subdivision (e), establishes the procedure for the appointment of a guardian for a minor who is a dependent child of the juvenile court.

Here the juvenile court found there was a likelihood that the children would be adopted, but the superior court effectively determined that the children could not be adopted since it refused to terminate the parental relationship.

The June 1, 1990, hearing was not only subsequent to the denial of the Civil Code section 232 petition, but it also followed the completion of the 366.25 hearing. Based on section 366, subdivision (b), provisions of section 366.3 control at this juncture rather than section 366.2.

Further support for that conclusion is found in California Rules of Court, rule 1465(b). Prior to 1991, that rule provided in relevant part:

"Following the establishment of a plan for long-term foster care, or when a child has been freed for adoption but is not placed in an adoptive home, review hearings shall be conducted every six months by the court or by a local review board, and subsequent permanency planning hearing to review

the continuing appropriateness of the plan shall be conducted by the court no less frequently than once every 18 months, throughout the continuation of foster care. The permanency planning hearing may be combined with the six-month review. If circumstances have changed since the last permanency planning hearing, the court may order a new permanent plan under section 366.25 or 366.26 at any subsequent hearing, or any party may seek a new permanent plan by a motion filed under rule 1432. Parents are to be given notice of all hearings unless their parental rights have been terminated. The court shall continue the child in foster care unless the parents prove, by a preponderance of the evidence, that further efforts at reunification are the best alternative for the child. In those cases, the court may order reunification services for a period not to exceed six months."

Effective January 1, 1991, California Rules of Court, rule 1465(b) has been modified as follows: "Following the establishment of a plan for long-term foster care, or when the court has *authorized the filing of a petition under Civil Code section 232 or* freed the child for adoption but the child is not placed in an adoptive home, review hearings shall be conducted every six months by the court or by a local review board. . . ." (Italics added.) The rule otherwise remains substantially the same. This modification clarifies that the section 366.3 procedure applies to hearings conducted after the making of the "authorization" order.

Case support is found in *In re Heather P.* (1989) 209 Cal.App.3d 886 [257 Cal.Rptr. 545], an appeal from a postpermanency-planning hearing, which declared, "A review hearing after a permanency plan is governed by section 366.3, not by section 366.2." (*Id.* at p. 891.)

*In re Elizabeth G.* (1988) 205 Cal.App.3d 1327 [253 Cal.Rptr. 161] addressed the specific issue of whether a court must make new findings that return to the parent would be detrimental to the child after an express determination of detriment was properly made at an earlier hearing. The appellate court held that when the "second status review was conducted in November 1986, the juvenile court expressly found [that return would be detrimental]." (*Id.* at p. 1332.) The court need not make similar findings at every subsequent status review hearing. "Section 366.3 provides for periodic court review following a permanency planning hearing." (*Ibid.*)

The juvenile court in *In re Elizabeth G.* had found that a return to the mother's custody would create a substantial risk of detriment to Elizabeth and ordered the matter be placed in the permanency planning program. The social services department was ordered to prepare a specific plan for adoption or guardianship. Elizabeth was referred to California Adoption Services, which had Elizabeth evaluated by two psychologists who recommended

adoption. At a subsequent review, the court authorized placement of Elizabeth in a preadoptive home when suitable. At the next review hearing, the court approved a preadoptive placement in the home of Elizabeth's aunt and uncle. The mother appealed.

The mother contended that the juvenile court failed to make necessary findings that Elizabeth's return to her custody would be detrimental and that the social services department failed to meet its burden of establishing that her return would create a substantial risk of detriment.

The *Elizabeth G.* court rejected the parents' contention that the juvenile court's failure to make such a finding of detriment violated the provisions of section 366.2, subdivision (e). The court noted:

"The flaw in appellant's argument is that section 366.2, subdivision (e) applies only to status review hearings before the adoption of a permanency plan. When the second status review was conducted in November 1986, the juvenile court expressly found 'by a preponderance of the evidence that the return of the minors [Elizabeth and Jennifer] to the parents at this time would create a substantial risk of detriment to the minors.' The court adopted a permanency plan. Once the permanency plan with appropriate findings had been adopted the court was not required to make similar findings at every subsequent hearing. Instead, the subsequent review hearings are governed by other statutory provisions.

"Pursuant to section 366, subdivision (a) the status of every child in foster care must be reviewed at least every six months until the permanency planning hearing is completed. Subdivision (b) provides: 'Subsequent to the permanency planning hearing periodic reviews of each child in foster care shall be conducted pursuant to the requirements of section 366.3 and 16503.' " (*In re Elizabeth G., supra,* 205 Cal.App.3d at p. 1332.)

The court further commented, "The order involved in this appeal was the third permanency planning order respecting Elizabeth. At the hearing it was to be presumed that continued care is in Elizabeth's best interest and the burden was on appellants to establish that further efforts at reunification would be the best alternative. (§ 366.3.)" (*In re Elizabeth G., supra,* 205 Cal.App.3d at p. 1333.)

Once a court determines that reunification is no longer possible, the overriding concern becomes providing a stable permanent home in which a child can develop a lasting emotional attachment to his or her caretakers. (*In re Baby Girl D.* (1989) 208 Cal.App.3d 1489, 1494 [257 Cal.Rptr. 1].)

Here, the burden of proof was appropriately on Barbara, just as it would have been had guardianship been the permanent plan all along, at the post-permanency-planning hearing to demonstrate that further reunification services would be the best alternative for the minor.

At the post-Civil Code section 232 hearing, Barbara was permitted to and did produce evidence. She testified and called a court-appointed expert on her behalf. Contrary to Barbara's appellate contention that the court failed to consider up-to-date information, much of the evidence presented covered Barbara's and the children's circumstances after May 2, 1989.

The evidence showed that Barbara had given birth to another child since the last hearing, a child then nine months old. It was not disputed that the new baby was born clean of drugs, and there was evidence that the mother was an attentive and caring mother for that child. However, Barbara still did not have adequate housing for the children. Her new mother-in-law, with whom Barbara was living, told the social worker that she could not have more than the one child in her home. Barbara then was planning to move in with her mother with all three of the children and presumably with her new husband.

 Barbara claims the juvenile court did not consider that Barbara "satisfactorily completed the reunification program within the allowable time period," at a time after May 2, 1989. To start, the only reference to the record to support that statement is found in Dr. Carmichael's testimony. The colloquy found there is as follows: "[¶] [By Barbara's counsel] . . . You stated also in here [the report] that you were aware that she completed her reunification plan prior to the one-year deadline from the detention hearing, correct? [¶] A. I made reference to that as based upon her report."

Dr. Carmichael's report contained the following: "She [Barbara] stated that she completed the reunification plan immediately prior to the one year deadline." This is no more than Barbara saying that she completed the plan, which the judge could reasonably choose not to believe.

Moreover, there is no "one-year deadline." The second six-month review hearing was properly held before an entire year expired since the children had been made dependents. Section 366.25 provides that the second six-month review hearing must be held no later than twelve months after the children are adjudicated. There is no requirement or guarantee of 12 months of services.

The state of the evidence in this record then is that Barbara did not complete the reunification plan within the time period allowed by the court.

Drug abuse was her most serious problem. No specific evidence was presented that she had completed the drug counseling program at any time.

Barbara has seized on the superior court's comments at the time of the Civil Code section 232 hearing to support her argument that the children should be returned to her. The court found that each of the conditions necessary to grant the Civil Code section 232 petition existed with one exception: "That leaves the final issue to be resolved: Is Barbara likely to fail in the future to maintain an adequate parental relationship with the children, which includes the providing of a suitable home, care and control for the children?" The court determined, "[T]he current situation of Barbara suggests that in the future she will be able to maintain an adequate parental relationship with the children."

The court did no more than decline to terminate Barbara's parental rights since it believed there would be a good chance for Barbara to regain custody of her children sometime in the future. "Naturally, if the section 232 petition were not granted, there would at least be the *possibility* that sometime in the future [the child] might be reunited with his parents, but this would not automatically mean there would be immediate, permanent reunification . . . ." (*In re David C.* (1984) 152 Cal.App.3d 1189, 1211 [200 Cal.Rptr. 115].)

■ Having denied the Civil Code section 232 petition, the superior court does not have the authority to take any further action in the case other than to order the matter back to the juvenile court for further proceedings, which it did.

The limited scope of a Civil Code section 232 hearing is demonstrated in *In re Christina L.* (1981) 118 Cal.App.3d 737 [173 Cal.Rptr. 722], in which the superior court had denied a Civil Code section 232 petition and ordered the children returned to the parents. The appellate court noted, "In so ordering, the superior court directly interfered with the juvenile court's dependency jurisdiction. . . . In sum, the issue before the superior court was simply whether there should be a complete and permanent severance of parental custody. Not before that court was whether it would be in the minor's best interests that the juvenile court continue to monitor such interests, . . ." (118 Cal.App.3d at p. 745.)

■ "If there is any substantial evidence to support the findings of a juvenile court, a reviewing court is without power to weigh or evaluate the findings." (*In re Carrie W.* (1978) 78 Cal.App.3d 866, 872 [144 Cal.Rptr. 427].)

 In ruling on the Department's application, the juvenile court applied the appropriate standard. Its findings were supported by substantial evidence.

### DISPOSITION

The appealed order is affirmed.

Ardaiz, Acting P. J., and Thaxter, J., concurred.

Appellant's petition for review by the Supreme Court was denied October 16, 1991.