Filed 9/1/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re V.L. et al., Persons Coming Under the Juvenile Court Law. | B304209 (Los Angeles County Super. Ct. No. 19CCJP01609A-B) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>M.L,<br><br>        Defendant and Appellant. | |

        APPEAL from an order of the Superior Court of Los Angeles County.  Lisa A. Brackelmanns, Judge Pro Tempore. Affirmed.

        John P. McCurley, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, Kristine P. Miles, Assistant County Counsel and Melania Vartanian, Deputy County Counsel, for Plaintiff and Respondent.

_____

M.L. (father) appeals from the dispositional order removing eight-year old K.L. (son) and 15-year-old V.L. (daughter) (collectively minors) from his custody.  Father argues that the record is insufficient to support removal of minors by clear and convincing evidence.  Further, he argues that the juvenile court's failure to state the reasons for its decision to remove minors requires us to reverse the order.  We conclude that the order must be affirmed.  Integral to analysis of the first issue, we heed the holding of *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995–996 (*O.B.*) establishing that when a statute requires a fact to be found by clear and convincing evidence, and when there is a substantial evidence challenge, the reviewing court must determine whether the record contains substantial evidence from which a reasonable trier of fact could find the existence of that fact to be highly probable.

## FACTS

**Background**

Y.R. (mother) was in a relationship with father when she gave birth to the minors.  After daughter was born, mother and father married.  Eventually, she started a relationship with L.M.  Mother and father separated while she was four months

pregnant with L.M.'s child, L.R.[1]  She later gave birth to L.R. in 2018.[2]

**Referral**

The Department of Children and Family Services (Department) received a call alleging emotional abuse of minors and L.R. by father on January 18, 2019.  The caller claimed father struck mother with his car as she was crossing a street; a woman named Gabriela got out of the car and pulled mother's hair; father did the same; and he was arrested for assault with a deadly weapon.

**Investigation**

<u>Evidence Regarding the January 18, 2019 Incident</u>

A neighbor provided the Los Angeles Police Department (LAPD) with surveillance video of the incident.  A Department children's social worker (CSW) spoke with an LAPD Detective, who stated the video showed that mother was the primary aggressor and father was the victim.  The detective also stated that father violated traffic laws because he drove past a stop sign at a high rate of speed.

The CSW summarized the surveillance video in the Department's detention report.  It showed that mother opened father's car door and attacked him.  Gabriela and minors' paternal uncle got out of the car to stop the attack.  Father tried to reverse out of his parking spot and nearly injured paternal uncle and Gabriela.  Mother and father then engaged in a mutual physical altercation, at which point paternal uncle walked away

---

[1]     The record suggests that father moved out of the family home in October 2017 after a domestic violence incident.

[2]     L.R. is not a subject of this appeal.

3

and then returned with paternal grandmother and son. "Prior to [father driving away], mother [ran] over to the passenger side of the vehicle, kick[ed] the door more than once, and appear[ed] to challenge . . . [Gabriela]." Father drove away, and son threw something at father's car. Father returned "a few seconds later driving northbound on the street, fail[ed] to stop at the intersection, and mother . . . walk[ed] towards the vehicle." The CSW wrote that the "video does not show mother being struck by a vehicle and it is unclear if she was injured during the incident. It is clear that mother instigated the situation and was the primary aggressor during the dispute, as father was sitting in his vehicle and he and his family members were blindsided by mother's attack."

Father stated that on the date of the incident, he was in his car with Gabriela and paternal uncle. Mother came out of nowhere and opened the car door. She began to slap and scratch father, and he could not get out of his car because she was holding onto his seatbelt. Paternal uncle got out of the car and tried to stop mother from hitting father, but mother tried to attack him, too. Gabriela got out of the car and she and mother started fighting over father. Father admitted that he grabbed onto mother "pretty hard" out of self-defense, and that he was very upset at her unprovoked attack. He disclosed that son saw them fighting. After father, Gabriela and paternal uncle got back in the car, father drove away but returned moments later to get his wallet and some keys that had fallen in the street during the altercation. Father stated he never struck mother with the car, but the car did bump into her when she got in the way. According to father, mother's statement to the police that he

4

assaulted her and intentionally struck her with the vehicle was a lie.

Paternal grandmother reported that paternal uncle came into her apartment asking them to call the police because mother had attacked father. Outside, paternal grandmother observed mother attacking father. Mother bumped into father's car when he tried to drive away.

Mother claimed that she drove to paternal grandmother's house to pick up son after he spent the night there. Mother parked far away and as she was crossing the street, she saw a blue Honda make a sudden U-turn and strike her. Gabriela exited the vehicle and paternal uncle held mother down while everyone pulled mother's hair, hit her, called her a whore, and told her to leave father alone. Son told different versions of what happened on January 18, 2019. In both versions, however, he consistently said father hit mother with his car and she went flying in the air. Daughter did not witness the incident. She said that when mother returned home following the incident, she "had lots of marks and scratches on her arms and knees. Her face was very swollen and her pants were ripped."

Mother and father separately provided photographs to CSW to document their injuries from the incident. They showed that mother had abrasions to her knees and elbows, and bruises to her left forearm, and that father had two large scratches along his right shoulder and clavicle, as well as a scratch along his lip and chin.

<u>History of Domestic Violence and Abuse</u>

Mother, daughter and son claimed there had been two prior domestic violence incidents while mother was pregnant: in August 2017 in Las Vegas, father punched mother in the

stomach; and, at a baby shower two months later in October 2017, mother and father fought over a phone which resulted in them knocking over tables and chairs. During the baby shower incident, daughter told her parents to stop fighting but they did not listen.

Per daughter, when father lived at the home, he would make minors kneel on the floor with boxes of rice or beans above them to tire them, and he would hit son with a belt or wire. Father was always angry.

Son said that when they lived together, father made him kneel on the floor while holding heavy items above his head, and father would sometimes "belt" son.

Mother and Father's Ambiguous Ongoing Relationship

After father moved out of the family home, he still frequented the family home and mother would cook for him. In August 2018, L.M. went to mother's home and saw father. This upset L.M. because he thought mother and father were in a sexual relationship.

Father's Representations

Father told a CSW that during the January 18, 2019 incident, mother told Gabriela that father was still in love with mother. He denied a history of domestic violence and indicated that mother has always been a jealous and insecure woman. He claimed mother made up the domestic violence allegations because she was upset he had moved on from her after he discovered that she was pregnant with L.M.'s child. Moreover, he claimed that his relationship with Gabriela had been affected by mother's insecurities because she had made harassing phone calls. He said he had to change his phone number in response.

In November 2019, father represented that Gabriela lived with him but was not his girlfriend.

**Detention Hearing**

At a detention hearing, the juvenile court ordered minors detained from father and released to mother. It also ordered: father to have visits with a monitor who was someone other than mother; father to stay away from mother and mother's house; and Gabriela to have no contact with minors. Minors' counsel requested and obtained an order that minors receive counseling, claiming they were showing great distress at the conduct of their parents, particularly father.

**Dependency Petition; Amended Petition; Jurisdiction Hearing**

The Department filed a petition under Welfare and Institutions Code section 300.[3] On May 1, 2019, Department filed an amended petition containing multiple counts; all but two counts were dismissed by the juvenile court. Those two counts, one under section 300, subdivision (a) and one under section 300, subdivision (b), alleged that mother and father "have a history of engaging in physical altercations" including "a recent incident . . . when [son] was present . . . [and] the parents engaged in mutual combat." They also alleged that in 2017 father "pushed the mother to the ground in the presence of [daughter] while mother was pregnant with [L.R]."

The juvenile court sustained the amended petition and ordered father to be given one hour of unmonitored visitation with minors a week.

---

[3] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

**Father's Participation in Services**

In June 2019, a service provider reported that father was participating in parenting and domestic violence classes. Department informed the juvenile court that father was having six hours of monitored visits and one hour of unmonitored visits per week with minors. It noted that minors said they enjoyed spending time with father.

In August 2019, father was granted unmonitored visits for six hours on Saturdays and six hours on Sundays. The juvenile court's order instructed father that Gabriela was prohibited from being present.

Father completed his 12-week parenting skills class in August 2019 and completed his 26-week domestic violence program in October 2019.

In September 2019, minors and father reported that Gabriela had been present for short periods of time—going "in and out" to pick up her belongings—during their unmonitored visits at father's home.

A month later, a CSW reported that the visits were going well and there had been no reports of Gabriela being present.

**Disposition Hearing**

In November 2019, the juvenile court held a disposition hearing and father's counsel requested it order minors placed in father's home. The juvenile court denied the request and placed minors with mother. As to father, the juvenile court ordered, inter alia, individual counseling to address case issues; enhancement services; and unmonitored visits. The Department was given the discretion to allow overnight visits after it saw father's home and did a background check on Gabriela.

The juvenile court found "by clear and convincing evidence that it's reasonable and necessary to remove [minors] from the home because there's a substantial danger to the physical health, safety, protection or physical or emotional well-being of [minors], and there are no reasonable means by which [minors'] physical health can be protected without removing [them] from the home and the legal and physical custody[,] care, . . . and control of the father."  It also found that "it would be detrimental to the safety, protection, or physical or emotional well-being of [minors] to be returned to the home and the care, custody, and control of the father."

Father appealed.

## DISCUSSION

This first issue raised by father is whether the order at the disposition hearing removing minors from his custody was supported by sufficient evidence.  The second issue is whether the removal order should be reversed because the juvenile court did not state the facts it relied upon.

## I.  Relevant Law; Standard of Review.

To remove a child from parental custody, the court must make one of five specified findings by clear and convincing evidence.  (§ 361, subd. (c).)  One ground for removal is that there is a substantial risk of injury to the child's physical health, safety, protection or emotional well-being if he or she were returned home, and there are no reasonable means to protect the child.  (§ 361, subd. (c)(1).)  "'Clear and convincing' evidence requires a finding of high probability.  The evidence must be so clear as to leave no substantial doubt.  It must be sufficiently strong to command the unhesitating assent of every reasonable mind. [Citations.]"  (*In re David C.* (1984) 152 Cal.App.3d 1189,

9

1208.) Actual harm to a child is not necessary before a child can be removed. "Reasonable apprehension stands as an accepted basis for the exercise of state power." (*In re Eric B.* (1987) 189 Cal.App.3d 996, 1003.)

Section 361, subdivision (e) provides: "The court shall state the facts on which the decision to remove the minor is based." (See *In re D.P.* (2020) 44 Cal.App.5th 1058, 1067; *In re Basilio T.* (1992) 4 Cal.App.4th 155, 171.)

A juvenile court's removal order at a disposition hearing will be affirmed on appeal if it is supported by substantial evidence. (*In re Amos L.* (1981) 124 Cal.App.3d 1031, 1038.) "Evidence sufficient to support the [juvenile] court's finding must be reasonable in nature, credible, and of solid value; it must actually be substantial proof of the essentials that the law requires in a particular case. [Citation.]" (*In re N.S.* (2002) 97 Cal.App.4th 167, 172.) We consider "the evidence in the light most favorable to respondent, giving respondent the benefit of every reasonable inference and resolving all conflicts in support of the [challenged order]. [Citation.]" (*In re Tracy Z.* (1987) 195 Cal.App.3d 107, 113.)

The court in *T.J. v. Superior Court* (2018) 21 Cal.App.5th 1229, 1238–1239 (*T.J.*) noted that "[t]he Court[] of Appeal do[es] not speak with one voice in describing how the substantial evidence standard is to be applied in dependency cases when the clear and convincing standard of proof was required at trial. Some cases hold the clear and convincing standard ""disappears"" on appellate review. [Citations.] Others suggest we conduct our substantial evidence review "'bearing in mind'" the heightened standard of proof. [Citation.]" T.J. concluded that a reviewing court must apply the latter standard, i.e., it must give credence to

10

the clear and convincing standard when applying the substantial evidence test.  (*Id*. at p. 1239.)

Our Supreme Court recently resolved any dispute on this matter when it issued its opinion in *O.B.* and held that "appellate review of the sufficiency of the evidence in support of a finding requiring clear and convincing proof must account for the level of confidence this standard demands. . . .  [W]hen reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true.  Consistent with well-established principles governing review for sufficiency of the evidence, in making this assessment the appellate court must view the record in the light most favorable to the prevailing party below and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence."  (*O.B.*, *supra*, 9 Cal.5th at pp. 995–996.)

*O.B.*, of course, is a conservatorship case, not a dependency case.  However, it signaled that its holding has broad application.  In examining the clear and convincing evidence standard, it observed that the standard applies to various determinations, such as termination of parental rights, involuntary commitment, deportation, liability for punitive damages, whether a conservator can withdraw life-sustaining care from a conservatee, whether conditions necessary for the nonconsensual, nonemergency administration of psychiatric medication to a prison inmate have been satisfied, and whether a publisher acted with actual malice in certain defamation cases.  (*O.B.*, *supra*, 9 Cal.5th at p. 999.)

11

Also, the court surveyed prior decisions discussing how a finding by clear and convincing evidence should be reviewed in dependency cases, among others. (*Id*. at pp. 1001–1004, citing T.J., *In re Angelia P.* (1981) 28 Cal.3d 908, and *In re Jasmon O.* (1994) 8 Cal.4th 398.) In a footnote, *O.B.* disapproved of a host of dependency cases to the extent that they are inconsistent with *O.B.*'s holding. (*O.B.*, *supra*, at p. 1010, fn. 7.) We conclude that *O.B.* is controlling in dependency cases.

## II. Evidence Sufficient.

### A. Analysis.

Mother and father had three violent altercations, two in 2017 and one at the beginning of 2019. The inference is that the first two incidents occurred in the presence of both daughter and son because they both reported the incidents to a CSW during their interviews. As to one of the 2017 incidents, daughter was present and tried to stop her parents' altercation. The 2019 incident occurred, in part, in the presence of son and resulted in mother and father suffering injuries after engaging in mutual combat initiated by mother. This evidence shows an ongoing cycle of domestic violence.

The inference from the CSW's summary of the surveillance video, the statement by the police to the CSW, and father's admission that mother bumped into his car is that father dangerously poor judgment by driving through a stop sign at a high rate of speed, that his car either made physical contact with mother or was near her, and that he recklessly endangered mother's life in son's presence. An additional inference is that son was so angered or upset by the last incident that he threw something at father's car.

Father denied a history of domestic violence and accused mother of fabricating the 2017 incidents, indicating that he is unwilling to admit his role in the domestic violence. The inference from his denial is that he is less likely to change his behavior in the future. Though father argues in the reply that he did not deny his role in the January 18, 2019, incident, all he does is admit that he told a CSW that he grabbed mother "pretty hard" out of self-defense. He does not acknowledge his role in prior incidents of domestic violence, and he seeks to minimize his role in the January 18, 2019, incident by focusing on an isolated moment. He adverts to a "Domestic Violence for Batter[er]s Progress Report" stating that he "has been participating in class sharing how important his children and others are [to] him and he really regrets his behavior and now []is learning how to love himself and others." This vague statement made by a third party does not establish that father accepts responsibility for his specific conduct.

Minors have been exposed to recurring domestic violence by mother and father, and the last incident precipitated the current dependency case. Even if a child suffers no physical harm due to domestic violence, a "cycle of violence between . . . parents constitute[s] a failure to protect [a child] 'from the substantial risk of encountering the violence and suffering serious physical harm or illness from it.' [Citations.]" (*In re T.V.* (2013) 217 Cal.App.4th 126, 135.) A parent's denial of domestic violence increases the risk of it recurring. (*In re Giovanni F.* (2010) 184 Cal.App.4th 594, 601; *In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197 ["One cannot correct a problem one fails to acknowledge"].)

13

When the evidence is viewed in the foregoing light, i.e., the light favorable to the Department, we conclude a reasonable trier of fact could have found it highly probable that placement of minors with father would pose a substantial risk of them being harmed by exposure to future domestic violence, and that there were no reasonable means to protect minors without removal from father's physical custody.

B. <u>Father's Arguments Unavailing</u>.

Father suggests that the finding a risk of harm was based only on the domestic violence that occurred in 2017, and that those incidents did not provide clear and convincing evidence of a substantial risk of harm and that no alternative means existed to protect minors. This suggestion is unfounded. The juvenile court sustained the amended petition, which contained an allegation about the January 18, 2019, incident involving mutual combat. Impliedly, the incident was part of the reason for removal. While the evidence showed that mother was the aggressor, it also showed the father engaged with mother and then drove his car in a reckless manner.

Citing to *In re Daisy H.* (2011) 192 Cal.App.4th 713, 717, father argues that the risk to the children of recurring domestic violence perpetrated by father was minimal because at the time of the disposition hearing, mother and he were separated and were living apart for several years. *In re Daisy H.*—a case holding that there was insufficient evidence of failure to protect— provides no guidance because it involved domestic violence that occurred seven years before the section 300 petition was filed, the children never witnessed domestic violence between the parents, the parents were separated, and there was no evidence of ongoing violence between them. Here, even though mother and father

14

were separated, the January 18, 2019, incident is evidence of ongoing domestic violence. The record further indicates that father was still frequenting mother's home as of August 2018, and that she had still been cooking for him after he moved out in October 2017. Even though he claimed mother was harassing Gabriela and him, the inference from the record is that mother and father's relationship is unresolved. Also, minors witnessed domestic violence between mother and father, who were unable to control themselves and stop fighting even when minors interacted during the fights. The foregoing establishes that *Daisy H.* is inapposite.

Next, father contends that his willingness to participate in services diminished any potential risk to minors. While that might be true, it is merely conflicting evidence regarding the risk that he posed to them. Under the substantial evidence test, it must be disregarded.

Father argues that minors did not have to be removed because they are old enough to report domestic violence in the future. But the issue is not whether the minors can report domestic violence after it happened. Rather it is whether there is a risk that they will be injured while any future domestic violence is occurring. Father also advances the notion that minors can be protected by the Department making unannounced visits. He relies on *In re Ashly F.* (2014) 225 Cal.App.4th 803 (*Ashley F.*), a case involving child abuse by a mother and a father's failure to protect his children from her. We are not persuaded. In that case, the children were removed from their home even though "ample evidence" showed there were reasonable means to protect them by unannounced visits by the Department, public health nursing services, in-home counseling, and removal of mother

rather than the children from the family home. The court asserted that mother had expressed remorse and was enrolled in parenting classes. For these reasons, the court reversed the removal order. (*Id*. at pp. 810–811.) None of these options would protect minors, as is proven by the latest incident of domestic violence. It took place on a public street and involved father engaging in mutual combat and driving a car recklessly. Home visits will not prevent that type of incident from occurring. The other two incidents of domestic violence also happened outside the home. On top of that, father denied a history of domestic violence, and he is a source of danger, so he is not in the same shoes as the father in *Ashley F*.

Taking a different tack, father suggests that the juvenile court erred because he "promptly and diligently engaged in services and has made substantial progress in addressing the issues that led to dependency." Father thus tacitly contends that he eliminated the risk of harm that he might have previously posed to the minors. But at the time of the disposition hearing, he had not yet attended individual counseling sessions to address case issues. Also, even though father may well have made progress with his services, we cannot second guess an order supported by substantial evidence.

In the reply, father objects to the characterization of the January 18, 2019, incident as mutual combat because the police identified him as the victim and the CSW said mother was the primary aggressor. He contends that he had every right to defend himself. We remind father that we must view the evidence in the light most favorable to the Department. Though mother was the primary aggressor, there was ample evidence from which the juvenile court could conclude there was mutual

16

combat. Regardless, once the altercation ended, father drove his car in a reckless manner. It is easy to conclude that driving his car in a reckless manner near mother was not necessary force "to protect from wrongful injury [to] the person or property of [himself], or of a spouse, child, parent, or other relative." (Civ. Code, § 50 [defining self-defense].)

**III. Failure to State Facts Harmless.**

Father argues that the juvenile court's failure to state the facts it relied upon is reversible error because the removal order is not supported by substantial evidence. Because we have determined that substantial evidence does support the removal order, we reject father's argument. Aside from this, a bedrock rule of appellate law is that we will not reverse an order unless we conclude it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error. (*In re J.S.* (2011) 196 Cal.App.4th 1069, 1078.) Here, because the last incident of domestic violence involving father was so dangerous and troubling, it is not reasonably probable that the juvenile court would have reached a different conclusion if it stated the facts it relied upon.

17

**DISPOSITION**

The order is affirmed.

**CERTIFIED FOR PUBLICATION**.


_____, Acting P. J.
ASHMANN-GERST


We concur:


_____, J.
CHAVEZ


_____, J.
HOFFSTADT