Filed 9/30/2020  In re T.M. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re T.M., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>　　Plaintiff and Respondent,<br><br>　　　　v.<br><br>S.M.,<br><br>　　Defendant and Appellant. | G058846<br><br>(Super. Ct. No. 19DP1181)<br><br>O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Gary L. Moorehead, Judge.  Affirmed.

Elizabeth C. Alexander, under appointment by the Court of Appeal, for Defendant and Appellant.

Leon J. Page, County Counsel, Karen L. Christensen and Deborah B. Morse, Deputy County Counsel, for Orange County Social Services Agency.

\*　　　　\*　　　　\*

S.M. (Mother) appeals from the juvenile court's dispositional order removing her son, T.M. ("child"), from her custody. She contends Orange County Social Services Agency (SSA) failed to meet its burden of proving there would be a substantial risk to the child if returned to Mother's custody. We conclude substantial evidence supports the dependency court's finding it was highly probable there would be a substantial risk of injury to the child's safety if returned to Mother's custody and there were no reasonable means to protect the child absent removal. Accordingly, we affirm.

I

FACTUAL AND PROCEDURAL BACKGROUND

A. *Initial Removal of Minor*

On September 18, 2019, the maternal aunt contacted law enforcement after a neighbor found the one-year old child wandering about the apartment while Mother had passed out after drinking too much. SSA initiated a child abuse investigation the following day.

Senior Social Worker Katie Glaser interviewed Mother about the incident. Mother denied she had passed out, claiming she only had "one cup of vodka with juice" before the neighbor and maternal aunt "showed up." Mother also denied current abuse issues, claiming this was the first time she drank alcohol in the last 30 days.

The neighbor told Glaser she has a key to Mother's apartment because the maternal grandmother asked the neighbor to check on Mother regularly. Yesterday the neighbor knocked on Mother's door, but no one answered. When the neighbor entered the apartment, she found Mother sleeping and the child wandering around. The neighbor then informed the maternal aunt, who came to the residence.

Glaser spoke with the maternal aunt, who stated Mother has had a drinking problem for 10 years. When the maternal aunt came to the apartment, she roused Mother and asked to take care of the child for the day. Mother became belligerent so the

2

maternal aunt called law enforcement. The maternal aunt confirmed Mother drank yesterday, and reported she smelled alcohol on Mother four days before the incident. The maternal aunt stated Mother is "an incredible mom" when sober, but "negligent" when she is drinking.

Glaser also spoke with the maternal grandmother, who confirmed that Mother has an extensive history of alcohol abuse for the past 13 years. She reported Mother "drinks heavily" and gets "intoxicated daily." The grandmother also stated Mother has liver disease related to alcohol abuse and was hospitalized for pancreatitis from December 2018 to January 2019. The grandmother heard the treating doctor tell Mother she would "die in the next few months" if she continued drinking. The grandmother expressed concern for the child's safety in Mother's care, but denied any concerns about Father. The maternal grandmother stated she is able and willing to provide care for the child, but noted that she has contacted the paternal grandparents, whom she believed would be a better fit because they were 15 years younger.

The paternal grandmother later called Glaser, explaining the maternal grandmother had asked her to call. The paternal grandmother stated she is "terrified" about the child's safety due to Mother's alcohol abuse. She reported that Father and Mother were married in 2014, and that same year Mother participated in an alcohol treatment program. Father joined the military, but had to return home because Mother was hospitalized for alcohol abuse. She reported that Father was living with her, and she stated she was willing and able to care for the minor.

Glaser spoke with Father, who was out of the country. Father stated he is legally married to Mother, but a divorce is pending. Father reported Mother alternates between episodes of binge drinking, typically lasting five days, and periods of soberness, lasting one week to one month. Asked why Father had not filed for full custody of the child, Father explained he did not want the child to "not have a mom," but stated he plans to file for full custody when he returned.

On September 20, 2019, SSA filed an application for a protective custody warrant based on the September 18 incident and the results of the child abuse investigation. The juvenile court granted the application, finding the child's physical environment posed a threat to the child's safety or health and there were no reasonable means to protect the child without temporarily removing the child from Mother's physical custody. SSA placed the child with the paternal grandparents.

At the September 25, 2019, initial detention hearing, Mother invoked her Fifth Amendment rights. The dependency court found it would be contrary to the child's welfare for the child to continue living in Mother's home. It detained the child and left the child in Father's care with protective orders. Mother was granted supervised visitation.

At the November 5, 2019, contested jurisdiction hearing, both parents were present. Father and Mother pled no contest to the dependency petition, amended by interlineation. The amended petition alleged the parents failed to supervise or protect the child because on September 18, 2019, Mother was found passed out from intoxication while the child was in her sole care. The juvenile court found the allegation true, and concluded the child fell within the provisions of Welfare and Institutions Code section 300, subdivision (b)(1).

B. *Mother's Participation in Services*

On October 3, 2019, Senior Social Work Thuy Le spoke with Mother about case plan services and programs. Le recommended Mother participate in counseling, outpatient substance abuse treatment, and substance abuse testing by means of a drug patch and a secure alcohol monitoring device. The following months, Mother regularly participated in services.

On October 31, Mother's psychologist, Dr. William Hunt, opined he was "unsure if therapy [was] going to be [e]ffective for [] [M]other" since she was "trying to do all the services at once" for the child to be returned to her care. Two months later, on

January 2, 2020, Hunt reported Mother needed assistance to "focus on responsibility for why she is in the situation she is in." The same day, Mother's therapist, Kim Till, reported that during the most recent therapy session, [M]other shared [that] the maternal grandmother contacted law enforcement, which led to the involvement [of SSA]. "[Mother] did not disclose any further information regarding her substance use and how substance use has impacted her life." Till stated Mother has not completed the counseling program; they were still in the building rapport stage.

On December 7, 2019, Mother's drug patch was positive for methamphetamine. On January 7, 2020, Mother's urine test was positive for methamphetamine. After being informed of the positive results, Mother denied using methamphetamine and suggested that her prescribed medication, Vyvanse, might affect the results. Le requested clarification from the testing facility, and was informed that although Vyvanse will cause a positive result for amphetamine, it would not cause a positive result for methamphetamine.

C. *Dispositional Hearing and Order*

At the January 15, 2020, disposition hearing, Le recommended the child remain with Father and that SSA continue to provide Mother with enhancement services. Le based her recommendation was based on Mother's lack of progress in her services and her recent positive drug tests for methamphetamine. Le concluded Mother had not yet "recognized any of her responsibility to why [SSA] was involved." Mother has not acknowledged her 13-year substance abuse problem alcoholism or her related medical conditions. Mother's "long history of alcohol" and "pattern of relapse" also factored into Le's assessment.

Father testified he and Mother got engaged while she was undergoing rehabilitation for alcohol abuse. Although Mother stopped drinking, she failed to complete the program, and resumed drinking. She often would hide alcohol in the home. The longest period of sobriety Father observed was six months. Father also testified he

often observed Mother taking Vyvanse in excess of what was prescribed. "The most concerning incident" for Father was in January 2015, while he was away at boot camp, the maternal grandmother called to inform him she was taking Mother to the hospital because Mother had passed out and Vyvanse pills were on the ground. Father did not believe the child should have unsupervised contact with Mother until she completed her services and demonstrated a sustained period of monitored sobriety.

Mother testified she had her first alcoholic drink when she was 11, and began regularly drinking in junior high school. Mother claimed her drinking became a daily habit in January 2015, after she and Father separated. She stopped drinking in 2017, after they reunited and she became pregnant with the child. She relapsed when they split up in July 2019. Mother was diagnosed with attention deficit disorder after college in 2012, and prescribed Adderall. She eventually switched medication to Vyvanse, and she has been taking one pill daily since 2012.

Mother acknowledged there was a risk to her child due to her alcohol abuse, and took responsibility for "why this case came into dependency." Mother admitted the underlying incident was not the first time she passed out while caring for her child. In 2018, she was under the influence of alcohol and took "a nap with my son." Mother stated she has been engaging in services and attending the Alcoholics Anonymous (AA) 12-step program, claiming she was on the last step of the program. Asked how she would react if she felt overwhelmed or craved alcohol, she responded she would "[n]ot ever drink." On cross-examination, Mother was asked about step 12 of the AA program, but described earlier steps in the program. She later conceded she could not "remember them all in order." Mother acknowledged her longest period of sobriety was two years. Asked whether she considered herself an alcoholic "now," she responded, "[N]ow I have not been drinking, but, yes, I consider myself having an issue in the past with it."

The maternal great aunt testified on Mother's behalf. She reported the three visits she supervised between the child and Mother were of good quality and Mother acted appropriately. On cross-examination, she conceded she was unaware why the child had been removed from Mother's custody, and conceded she would be concerned if Mother had passed out and the child was wandering around the apartment.

Dr. Rody Predescu testified as Mother's expert on laboratory testing. Dr. Predescu opined Mother's positive drug patch test for methamphetamine could be caused by environmental exposure. However, Dr. Predescu conceded that drug patch tests were generally reliable and that she could not rule out the possibility Mother ingested methamphetamine.

The juvenile court removed the child from Mother's custody and placed the child with Father. The court ordered SSA to provide family maintenance services, with Mother receiving enhancement services. The court found Mother "has had a significant alcohol abuse problem since she was in high school and throughout her college career. She has been a binge drinker since then [and] up until this dependency filing. Her alcohol abuse has been a regular part of her life for the last 16 years." Mother "has been a danger to her child due to her alcohol abuse issues before and at the time this matter came before the court five months ago." Mother has engaged in services and appears "dedicated to her road to sobriety." However, the court found Mother "somewhat naive in her belief that she is clean and sober enough to care for her child at this time. Ten to 12 years of dealing with this severe disease does not resolve quickly, and relapses are common." "[I]t takes months, if not years to retrain oneself into not succumbing to those triggers and temptations that ultimately result in relapses." The court noted Mother claimed to be on "step 12 of her AA program but cannot clearly recall the goal of step 12. Her desire to get through her programs as quickly as possible to regain custody of her son is admirable, but also somewhat misplaced. It's the deep focus and thorough understanding . . . that will help overcome" her addiction. The court found there was

7

clear and convincing evidence that Mother was not far enough into her recovery to have the child returned to her custody. The court noted that although it found Dr. Predescu's testimony on Mother's drug tests unpersuasive, the tests "while a factor" were "not significant" to the court's findings.

## II

### DISCUSSION

"[A]t the dispositional hearing, the court must decide where the child will live while under its supervision, with the paramount concern being the child's best interest." (*In re Corey A.* (1991) 227 Cal.App.3d 339, 346.) To remove a child from parental custody, the court must make one of five specified findings by clear and convincing evidence. (Welf. & Inst. Code, § 361, subd. (c).) One ground for removal is that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (Welf. & Inst. Code, § 361, subd. (c)(1).) "The parent need not be dangerous and the child need not have been actually harmed for removal to be appropriate. The focus of the statute is on averting harm to the child. [Citations.] In this regard, the court may consider the parent's past conduct as well as present circumstances. [Citation.]" (*In re Cole C.* (2009) 174 Cal.App.4th 900, 917 (*Cole C.*).) "'Some risks may be substantial even if they carry a low degree of probability because the magnitude of the harm is potentially great. . . . Thus, in order to determine whether a risk is substantial, the court must consider both the likelihood that harm will occur and the magnitude of potential harm . . . .' [Citation.]" (*In re I.J.* (2013) 56 Cal.4th 766, 778.)

"'Clear and convincing' evidence requires a finding of high probability. The evidence must be so clear as to leave no substantial doubt. It must be sufficiently

strong to command the unhesitating assent of every reasonable mind. [Citations.]" (*In re David C.* (1984) 152 Cal.App.3d 1189, 1208.) "When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true. In conducting its review, the court must view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011-1012.)

Mother contends SSA "failed to present clear and convincing evidence that [the child] faced 'a substantial risk to his physical health, safety, protection or emotional well-being,' necessitating removal from mother's custody." We disagree. Mother conceded her alcohol abuse posed a risk to the child's physical health or safety. The child was initially removed from Mother's physical custody because there was a substantial risk to the child's physical health or safety. Mother had passed out from alcohol intoxication, leaving the child, then one year old, wandering around the apartment unsupervised. She also admitted she passed out and left the child unsupervised on a prior occasion.

Mother argues the evidence showed she has availed herself of services, mitigating any future risk to the child. However, the record shows she made insufficient progress. Mother claimed she was on the last step of the AA program, but could not articulate the steps of the program correctly. In addition, Hunt and Till both reported Mother failed to accept full responsibility for her actions during counseling and therapy sessions. (Cf. *In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197 ["One cannot correct a problem one fails to acknowledge"]; see also *In re A.F.* (2016) 3 Cal.App.5th 283, 293

9

["In light of mother's failure to recognize the risks to which she was exposing the minor, there was no reason to believe the conditions would not persist should the minor remain in her home."].)

The evidence also showed Mother is prone to relapses. Mother previously started an alcohol abuse rehabilitation program, but failed to complete it. After leaving the program, Mother resumed drinking before stopping when she was pregnant. After the child was born, she began drinking again. Mother has not completed her counseling or AA program. Her five months of sobriety at the time of the dispositional hearing was considerably less than her longest period of sobriety. In short, nothing suggests Mother would not relapse again. (Cf. *In re J.C.* (2014) 233 Cal.App.4th 1, 7 ["Given [Father's] years-long struggles with drug abuse, his seven months of sobriety did not mean that he was no longer at risk of relapsing."].) Thus, substantial evidence supports the dependency court's finding it was highly probable there would be a substantial danger to the physical health or safety of the child if the child were returned to Mother's physical custody.

We also conclude the record as a whole contains substantial evidence from which the juvenile court could have found it highly probable there were no reasonable means to protect the child if returned to Mother's custody. Mother notes the juvenile court failed to make a specific finding on this issue, but the court's failure to make the required finding was harmless because "'it is not reasonably probable such finding, if made, would have been in favor of continued parental custody.' [Citations.]" (*In re Jason L.* (1990) 222 Cal.App.3d 1206, 1218.) As noted, when the juvenile court granted SSA's application for a protective custody warrant, it found no reasonable means were available to protect the child absent temporary removal from Mother's custody. Given Mother's lack of progress in services and risk of relapse, described above, no evidence undermines the court's prior finding on the lack of reasonable means to protect the child if the child were in Mother's custody.

10

For the first time, Mother suggests there were less drastic alternatives to removal, such as having a relative move in with Mother or having an extra social worker monitor the situation. Because it was not raised below, Mother forfeited this argument. (See *In re Miguel C.* (2011) 198 Cal.App.4th 965, 970.) Even if not forfeited, the suggested measures would not obviate the risk to the child. It is outside the court's power to order a relative to move in with Mother or to order the relative to allow Mother to move into the relative's home. Even if a relative began living with Mother, it is speculative to assume the relative would care for the child were Mother to relapse, especially if Mother hides her alcohol consumption. Having an extra social worker monitor the situation would be even less effective in ensuring the child's safety. As an appellate court has noted, "[u]nannounced visits can only assess the situation and mother's sobriety at the time of the visit," "which would be after mother had already placed the minor at risk." (*In re A.F.*, *supra*, 3 Cal.App.5th at p. 293.) In sum, we conclude the record as a whole contains substantial evidence from which the juvenile court could have found it highly probable there would be a substantial risk of injury to the child's physical health or safety if the child is returned to Mother's physical custody and there were no reasonable means to protect the child absent removal.

11

## III

### DISPOSITION

The dispositional order removing the child from Mother's physical custody is affirmed.

ARONSON, ACTING P.J.

WE CONCUR:

IKOLA, J.

THOMPSON, J.

12