Filed 8/21/23  In re J.P. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re J.P. et al., Persons Coming Under the Juvenile Court Law. | |
| FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>R.P.,<br><br>Defendant and Appellant. | F085493<br><br>(Super. Ct. Nos. 22CEJ300105-1, 22CEJ300105-2, 22CEJ300105-3, 22CEJ300105-4, 22CEJ300105-5, 22CEJ300105-6, 22CEJ300105-7, 22CEJ300105-8)<br><br>**OPINION** |

## THE COURT*

APPEAL from findings and an order of the Superior Court of Fresno County. Kimberly J. Nystrom-Geist, Judge, and Todd D. Eilers, Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)†

Sarah Vaona, under appointment by the Court of Appeal, for Defendant and Appellant.

Danial C. Cederborg, County Counsel, and Ashley N. McGuire, Deputy County Counsel, for Plaintiff and Respondent.

---

\*        Before Hill, P. J., Levy, J. and Franson, J.

†        Temporary Judge Eilers presided on March 30, 2022; Judge Nystrom-Geist presided over all other hearings pertinent to this appeal.

At a combined jurisdiction and disposition hearing, the juvenile court declared the eight children of R.P. (mother) dependents under Welfare and Institutions Code section 300, subdivisions (a) and (b)(1),[1] ordered their continued removal from mother's and father's physical custody under section 361, subdivision (c)(1), and ordered reunification services for both parents. Mother challenges the juvenile court's dispositional order removing her eight children from her custody. She claims the juvenile court committed prejudicial error when it failed to consider reasonable alternatives to prevent or eliminate the need to remove the children from her physical custody. (See § 361, subds. (c)(1)(A),(B), (e).) We find substantial evidence supports the juvenile court's dispositional order and affirm.

## COMBINED FACTUAL AND PROCEDURAL BACKGROUND

### I.     Referral.[2]

At the time the May 4, 2022 jurisdiction and disposition report was written, J.P. (14 years old), J.A. (10 years old), J.J. (nine years old),[3] D.G. (seven years old), X.G. (five years old), J.G. (three years old), and twins (two years old) lived with their mother and D.G., the father of the youngest five children.[4] Mother and father (or collectively, the parents) had been dating for approximately nine years. Mother worked from 7:00 a.m. until approximately 7:00 p.m.; father worked from 4:00 p.m. until 12:00 a.m.; and J.P. supervised the children between 3:30 p.m. and 8:00 p.m.

---

**1**     Undesignated statutory references are to the Welfare and Institutions Code.

**2**     The facts recited in this section are taken from the May 4, 2022 jurisdiction and disposition report by the Fresno County Department of Social Services (DSS).

**3**     D.G. is not the father of J.P., J.A., or J.J., but their fathers are not relevant to issues raised by mother. We shall refer to D.G. as father, although he is not father to the three older children. Further use of the initials D.G. refers to seven-year-old D.G.

**4**     While the police report indicates that father and mother share six of the children, the juvenile court records indicate that they have only five children together.

The family had six referrals to DSS dating back to 2014 that were deemed unfounded, inconclusive, or "evaluated out."[5] On March 25, 2022, DSS received a referral from X.G.'s school that father had punched X.G., resulting in a black eye, and that J.A. had issues with hygiene and emotional outbursts. Child Protective Services Social Worker Juan Medina contacted mother at her home that day. As he followed mother to the kitchen, Medina detected a strong odor, observed the floor was sticky and dirty, and saw trash and food throughout the kitchen. X.G. had a black eye, dirty hands and feet, and appeared to have not showered in several days. When Medina asked what was going on, mother replied, " '[Y]ou tell me, you're the one here.' " Mother then told Medina that she had not been present, but that X.G. claimed father hit him. Mother explained that she did not call law enforcement because she did not know what to say and she had kicked father out of the home two days earlier.

Medina called the Fresno Police Department and, at approximately 9:15 p.m., Officers Richard Ramirez and Andrew Diaz contacted Medina at the home. X.G. had a fading circular black bruise around his right eye that covered his eye and cheekbone and small scabs near his ear on his face. X.G. was skinnier and dirtier than the other children.

---

[5] The term " 'evaluated out' means the child protective services screener did not find sufficient evidence of physical abuse or child abuse and neglect to assign the referral to an investigation." (*In re Aurora P.* (2015) 241 Cal.App.4th 1142, 1149, fn. 4.) DSS received a referral of general neglect and sexual abuse (as to J.A.) in 2014 that alleged mother smoked marijuana in front of the children and mother alleged sexual abuse of J.A. by a relative when visiting his father. Referrals alleged that mother failed to take J.A. to medical appointments for leukemia treatments (2017) and J.A. looked ill and unkempt (2019). A reporting party alleged in December 2021 that J.P. was overwhelmed caring for her younger siblings alone and the home was cluttered and had clothing everywhere and poop on the walls. In January 2022, a reporting party alleged that J.A. and D.G. came to school two days in a row smelling of urine, and J.A. also smelled of urine when in his wrestling uniform and was argumentative and dismissive. In February 2022, a reporting party alleged that mother and father left the children alone in the care of J.P. and J.A., J.J., and D.G. were playing near a street without adult supervision for hours before J.P. arrived home.

Medina and police officers spoke with X.G. Medina observed that X.G. was wearing dirty pajamas, had black marker on his arms, and appeared nervous and timid. X.G. did not answer when asked about the injury to his face. He told officers that mother told him not to talk to the police, that nothing happened, and then claimed that his brother, J.G., hit him with a ball. X.G. denied being afraid of anyone, and when asked if he was afraid to tell the truth, X.G. told Medina that " 'she doesn't hit me' " and he never gets spanked, slapped, or punched. X.G. did say to officers that father would not go to jail if he had not hit X.G.

Medina described J.P.'s room as being dirty with a foul odor, debris all over the carpet, and a stained twin mattress that did not have any clean portion.

The room shared by the male children was "very dirty with cockroaches on the wall and feces on the ground." Medina described this room as being dirty and covered in plastic wrappers, food crumbs, and other debris. Medina described the bed as being two twin bedframes close together with a large and thin mattress topper, although Officer Diaz described the bed as two small mattresses on one broken bed frame. Stains and marker writing covered the walls, and the room was bare of any clothing or other furniture. Mother told Medina that the clothing was in the laundry room waiting to be cleaned.

The bathroom next to this bedroom was dirty, smelled of urine and unwashed clothes, and had an unflushed toilet, no operational light, plugged sinks full of water, dirty clothes on the floor, and cockroaches. Mother told Medina that the bathroom was not being used, but an officer heard the children going in and out of the room. Mother told Medina that the toilet was not working, and she had not contacted management regarding the nonfunctional bathroom because she works.

Mother showed Medina and officers a second functional bathroom that she claimed was used by the children, but officers saw that it was locked, as if preventing the

4.

children from using it, and mother had to unlock it with a key. This bathroom was also dirty, and mother would not permit them to enter it.

Mother identified another bedroom as a laundry room, and officers saw that it contained cockroaches, a large amount of dirty clothing, trash in the closet, and stained walls. Although mother would not permit entry to the room, Medina could see a large pile of sheets, clothing, and blankets but was unable to observe any children's clothing. Mother told Medina she did not have clean clothes for the children.

Officers observed that the kitchen also had cockroaches, was dirty, and the only readily consumable food was a box of pizza. One officer noted that the living conditions in the home had been documented in 2021 and were similar to current conditions.[6]

Mother told officers that she had left for work on Wednesday, March 23, 2022, at approximately 7:00.am. According to mother, father cared for the children until he left for worked at approximately 3:15 p.m., and J.P. cared for the four youngest children thereafter, while the remaining three children attended an after-school program. Mother returned home at approximately 9:00 p.m. and noticed that X.G. had a bruise on his eye. Mother called father who claimed that he spanked or "smacked" X.G., and mother then made father immediately move out. She claimed that while she did not know where father was living, she believed he was sleeping in his car nearby. Mother admitted that father continued to watch the children the next two days because she had no other option. Mother told the officers that she did not send X.G. to school so that school officials would not see his injury, and she neither sought medical attention for him nor did she report the incident to the police because father was no longer living at the home.

Mother stated that X.G.'s injury was a small bump when she initially saw it but X.G.'s eye was black the following day. While X.G. had scratches, mother adamantly claimed that the scratches were caused by fighting between X.G. and his siblings. Father

---

**6** This may be a reference to the 2021 referral to DSS.

was not present during mother's interview with the officers because he had left for work earlier, at 4:00 p.m.

Mother told Medina that she never spanked the children and disciplined them by yelling. Father spanked the children on their behinds but never bruised them. Mother denied that she ever used drugs and only drank alcohol occasionally.

J.P. advised Medina and the officers that father had moved out the previous day. J.P. was uncooperative and claimed that while she saw X.G.'s injury, she did not know or ask what happened to X.G. J.P. claimed that she did not know anything and said that X.G. makes a mess and "there are 'consequences.' " She assumed that X.G. got hit but claimed she did not know who did it. J.P. also denied that anyone in the home used drugs.

J.A. told officers that he saw X.G. had a bruise two days before and heard mother ask father whether father had slapped X.G. J.A. thought father hit X.G. because he heard mother ask father about it. Father had slept at the home the prior evening and J.A. last saw father that morning. J.A. also told officers that father once slapped his arm and left a red mark but did not punch or slap the children as punishment. J.A. did not see father strike X.G.

J.J. told officers that X.G. got " 'slapped' " by father who was mad that X.G. had eaten cereal in the closet. J.J. did not see this, but X.G. told J.J. that is what happened. J.J. claimed that X.G. always told them that X.G. will call the cops, but J.J. did not know why X.G. said this. When asked again about X.G.'s injury, J.J. said that X.G. had a bruise on his eye because he was hit by a basketball at school and J.J. told that to his teacher. According to Medina, J.J. told Medina that " 'my dad did not give [X.G.] the black eye.' " J.J. first told officers that his parents yelled at him when he needed discipline, but then said that father had punished J.J. the past by spanking his hands.

D.G., while not able to demonstrate he knew the difference between the truth and lies, advised that father slept in the home the previous night and that father's clothing was

in the home. D.G. stated that mother and J.P. punished him by spanking him with a belt, and mother punished him by spanking him with a telephone wire. Medina reported that D.G. said that he did not know if father ever spanked him. D.G. explained that they came home from school and made a mess and " 'my dad hit my brother [X.G.] and gave him a black eye.' " D.G. said that he did not see it, and mother did not want the children to tell anyone about the black eye.

An officer spoke with father by telephone. Father told the officer that he heard a child cussing in the bedroom and determined that it was X.G. Intending only to backhand X.G. in the mouth, father struck X.G. with his knuckles when X.G. backed away from him. He estimated the force of the blow was a four or five on a scale of one to 10. Approximately 30 minutes later, father saw a small bump on X.G.'s eye which darkened to a bruise the following day. Father stated that he only intended to discipline X.G. and not to hurt him. Father admitted that he did not seek medical attention for X.G. and kept him home from school because father did not want to lose X.G. While mother was angry with father, father continued to care for the children. He usually disciplined the children by spanking them with an open hand that left red marks but never bruises.

Medina and Diaz discussed the children's statements and Diaz reported that the children appeared to have been coached by mother not to speak of the incident truthfully. Officers took all eight children into protective custody, and DSS placed the children separately with two relatives.

## II.      Juvenile dependency petition and detention hearing.

### A.      Dependency Petition

On March 29, 2022, DSS filed a juvenile dependency petition alleging that the children came within the juvenile court's jurisdiction under section 300, subdivisions (a) (risk of serious physical harm) as to mother and (b)(1) (failure to protect) as to mother and father. The petition alleged that father caused serious physical harm to X.G. when he

7.

hit X.G. in the face with his hand, causing injury to X.G.'s eye and face, and that X.G.'s siblings were at substantial risk of suffering severe physical abuse. (See § 300, subd. (a)). The petition further alleged that: (1) mother had a marijuana abuse problem that hindered her ability to provide regular care, supervision, and protection to her children and exposed the children to her poor judgment, an unhealthy home environment, and poor hygiene; (2) mother failed to protect the children from father and left the children in his care after father had given X.G. a black eye and failed to report the incident to law enforcement or seek medical treatment for X.G.; (3) father had a marijuana and cocaine abuse problem that hindered his ability to provide regular care, supervision, and protection to the children and exposed the children to his poor judgment, an unhealthy home environment, and poor hygiene. Father smoked marijuana when the children were present and tested positive for cocaine and marijuana on March 28, 2022.

### B. Detention Hearing

On March 30, 2022, the juvenile court found a prima facie showing had been made that the children were persons described by section 300 and ordered the children detained from both parents. The court found that continuation of the children in the parents' home was contrary to the children's welfare and found a substantial danger to their physical or emotional well-being, that reasonable alternatives to removal had been made but there existed no reasonable means to protect the children without removal. The court directed DSS to provide mother and father with supervised visitation at its discretion, parenting classes, evaluation and treatment for substance abuse, mental health and domestic violence assessments, and random drug testing. A combined jurisdiction and disposition hearing was set for May 4, 2022.[7]

---

[7] This hearing was continued to June 22, 2022, October 4, 2022, October 12, 2022, and December 20, 2022.

8.

## III.        Jurisdiction and disposition hearing.

A combined, contested jurisdiction and disposition hearing commenced on December 20, 2022. The juvenile court issued it's ruling the following day, on December 22, 2022. The juvenile court admitted into evidence DSS's May 4, 2022 jurisdiction and disposition report and a July 19, 2022 investigative report and relied upon a June 22, 2022 addendum report in ruling. Social Worker Christopher Sanchez, mother, and father testified at the hearing.[8]

### A.        May 4, 2022 Jurisdiction and Disposition Report

In addition to the facts set forth *ante*, in part I., the jurisdiction and disposition report included conversations with the parents and children that occurred after March 25, 2022. Social Worker Kiana Taylor spoke with mother by telephone on March 28, 2022. Mother said she was not present when father hit X.G., did not call law enforcement after learning that father hit X.G. because of her work schedule, and had father return to the home because she needed him to watch the children. Mother also said that if she knew father was not supposed to be there, then she would not have let him come back. According to the report, mother agreed to do whatever was necessary to have the children returned and understood she was at fault for not protecting them. She said that she could do better at cleaning, she has a lot of children, it was sometimes hard to keep up with everything, she would find a babysitter, and she was willing to take parenting classes.

During an in-person interview on March 28, 2022, with mother and father, both parents claimed that they disciplined the children by yelling at them. They also admitted to using marijuana. Mother claimed to use marijuana only on the weekends, and father claimed to use marijuana when stressed or to sleep at night, but both denied using any other drugs. Both parents similarly denied any incidents of domestic violence. Father explained again that he intended to hit X.G. in the mouth because X.G. used bad

---

[8]        J.A. and J.J.'s father also testified in support of his request for placement of the two children. His testimony is not relevant to mother's issues raised in her appeal.

language and accidently hit him in the eye, but father did not intend to hit X.G. hard. At the time of the interview, mother had a black eye and explained that father's sister hit her when mother accused father's sister of reporting the family to DSS.

Mother was asked about the children's clothing and claimed that a prior home had been infested with roaches that had gotten into their clothing and clothing drawers. As a result, mother decided not to bring the dressers into the new home and used plastic containers for their clothing until the children broke them. Since then, mother has stored the children's clothing in her room. When asked about the condition of the home, mother stated that she does clean it, but that she is tired after working all day, although she does try to clean every day. Mother also said that the children dirty the home, and with eight children, she found it difficult to keep clean. Taylor observed that the home had been picked up and the floors were clear, but she recommended cleaning the carpets due to odor. The bed linens and pillows were clean.

Taylor confirmed that the bathroom toilet and sink were functioning. Mother said that the toilet was not draining water due to a "little ball on the top," and the children continued to use it even after she told them not to. Mother told Taylor that she did not send X.G. to school because she was afraid that her children would be removed and did not know what else to do.

Father told Taylor that he was ashamed that he blackened X.G.'s eye by "accident," and that he realized it was wrong to keep X.G. out of school because "now it look[ed] worse." They both claimed to understand why DSS was involved.

Father was told that his drug test was positive for cocaine and marijuana. Father claimed that he had used cocaine for the first time on the evening of March 25, 2022. Mother stated that she did not know that father used cocaine.

Follow-up interviews of the children were conducted that same day. When J.A. was interviewed, he said that the children had not had any clean clothes since Thanksgiving 2021. J.A. reported that he had watched the younger children all day on

10.

one occasion. J.A. further reported that father had once slammed his head against the counter when he was nine years old.

During D.G.'s follow-up interview, he claimed to always have clean clothes and described his home as dirty and having dog poop on the floor a lot, but he claimed that they cleaned it up. D.G. said that mother and father would punish him by hitting him with their hands but did not bruise him or leave marks. J.P. hit the children when she was caring for them and they did something bad.

J.P. said that mother and father would yell at her when she was in trouble and slap the other children on their hands. She denied any drugs or alcohol were used in the home.

J.J. said the children have not had clean clothes since before the Christmas holidays in 2021. He described the home as messy but not dirty because of the trash and papers in the home and claimed that the dog poop was cleaned up. Mother and father disciplined the children by hitting them with their hands but did not leave marks and bruises.

X.G. continued to claim that his brother hit him in the eye, not father, and denied that the home was dirty and not having clean clothes.

A team decisionmaking meeting took place on March 29, 2022. Mother stated that DSS was involved because she did not report X.G.'s injury to the police, that the home was dirty, and the children did not have clean clothes. Father similarly described these reasons when explaining DSS's involvement in their family. A social worker advised the parents that DSS was also involved because of their drug use.

In discussing the injury to X.G.'s eye, father again explained that he intended to smack X.G. on the mouth because X.G. continued to cuss when told to stop but back-handed him in the eye because he turned his head. Mother said that she had not known what to do and thought that kicking father out of the home was "enough." She also said that she would have done more if she had known she needed to do more, but their work

11.

schedules required father to come back to the home to watch the children. Mother told the social worker that she believed father was a good parent, although they both got frustrated due to the number of children. Mother further stated that the children received bruises from each other, but the children would confirm that mother and father do not bruise them.

Neither parent responded when asked about J.A.'s claim that father smashed J.A.'s head into a counter and that the children reported their parents spanked them and permitted J.P. to spank them. Mother explained that while the bathroom was broken, the children had disobeyed her and continued to use it rather than use her bathroom. She claimed that she had been washing clothes when DSS came to their home on March 25, 2022, and that the children were dirty because they had just eaten chicken wings. According to mother, the children were wearing dirty clothes at the time of the visit because they were getting the clothes from the laundry room where she kept the dirty clothes. She agreed that she should have worked harder to clean their clothes and locked the laundry room to prevent them from wearing dirty clothes. Father claimed that he cleaned the home in the mornings and that the children preferred to wear the clothes they liked even if dirty.

Father explained his cocaine use as resulting from stress and claimed that he did not do it at home with the children present. Father described using marijuana every other day, and that he last used it the day before. Father explained that he smokes marijuana like other people smoke cigarettes, he does not believe that it interferes with his ability to care for the children, and it motivates him to do better for them. Father later described himself as a daily user of marijuana and that he used marijuana when the children were present. Father admitted that he had a substance abuse problem and that he would attend drug, anger management, and parenting classes for the children.

Mother claimed that she last used marijuana the day before and that she usually only used it on the weekends. She admitted that she used marijuana when the children

12.

were home, but claimed she used it only after they were asleep, and that smoking marijuana gave her energy.

Only one of the nine other relatives present during the meeting felt that mother and father's marijuana use was a problem in caring for the children. The other relatives believed that DSS was overreacting. DSS concluded that the relatives would not provide the accountability needed if the children were returned to the parents. The report noted that the parents admitted that they needed services such as substance abuse, anger management, and parenting classes.

On March 29, 2022, Taylor contacted mother and explained that a voluntary family maintenance plan was not possible because supporting relatives failed to understand the safety concerns and would not hold the parents accountable. Mother stated that she did not understand and wanted to know when the children would be returned. Taylor explained the process for family reunification to mother and advised that if she attended all her assigned classes, the juvenile court might order reunification as early as within six to nine months.

On April 12, 2022, during a family reunification meeting, a social worker learned that J.P. had been "5150'd" the prior weekend and taken to a facility in San Jose for mental health treatment for a week.[9] J.P. had threatened to hurt herself if not placed with her siblings. J.P. advised that she had a history of depression, anxiety, and anger issues and cuts herself.

The report concluded that both parents needed mental health, substance abuse, and domestic violence assessments and any recommended treatments, parenting services, and random drug testing. Because the parents had not finished the court-offered services to

---

[9]     Section 5150 permits a peace officer to take a person into custody involuntarily and place them in a facility for evaluation and treatment if that person is a danger to themselves or others as the result of a mental health disorder. (§ 5150, subd. (a).)

the extent required to safely care for the children, DSS concluded that it would not yet be safe for the children to return to the parents.

Mother was notified on March 30, 2022, that she had been registered for a parenting and nurturing program, a substance use disorder orientation, drug testing, a domestic violence index, and a mental health assessment. Mother enrolled in the parenting and nurturing class on April 22, 2022. Mother attended the substance use disorder screening but did not meet criteria for such services. Mother registered for random drug testing and was compliant with no positive tests as of April 28, 2022. After mother attended a domestic violence index, it was recommended that she participate in 52 sessions of weekly child abuse intervention classes. Mother completed a mental health assessment, and she was not recommended for therapy.

### B.  July 19, 2022 Investigation Report

Fresno Child Advocates filed a report of investigation on July 19, 2022, that the juvenile court admitted into evidence. J.P. reported that she participated in mental health therapy twice bi-weekly, enjoyed visits with mother, but wanted to expand visitation to spend weekends with mother. J.P. described living with her parents was "ok" but stated that she did not have social life during that time because she was required to care for her siblings at all times. Her parents were not home a lot and often out with friends or working. J.P. acknowledged that X.G. was a problem child and often in trouble and that father overdid things when he was angry. She stated that X.G. was usually spanked on his hand and sent to his room.

J.P. also said that on her birthday, father kicked J.A. in the stomach, causing him to fall into a wall, and father kicked him once more. She did not see it but heard mother and father discussing it. Mother threatened to call the police, but J.P. was not aware of whether she did. Father left the home when it happened but returned the next day.

14.

J.A. had supervised visits with mother and wanted them to continue and to expand to include weekends. He was at an after-school program when X.G. was hit in the eye, but X.G. said that father had hit him. Father admitted to mother that he slapped X.G., and mother yelled, " '[N]o, you punched him.' " Mother told father not to do it anymore, and father continued to live in the home. J.A. said that on J.P.'s birthday, father got mad and pushed J.A.'s face into the counter, which caused his nose to bleed. Father then pushed J.A. to the ground and kicked him twice in the stomach. Mother found out and told father to leave, but father returned to the home within a few hours.

J.J. said that he enjoyed visits with mother and wanted them to expand to weekend overnights once a month. According to J.J., X.G. said that father hit X.G. in eye, and mother kicked father out, but father returned the same day and continued living in home. Mother and J.P. told him not to discuss X.G.'s injury with anyone.

J.P.'s custodian said that when J.P. was placed, she had problems in school and was caught stealing school supplies, smoking marijuana on school grounds, and inappropriately touched another student. J.P. has a disciplinary contract with her school and must be accompanied by a supervising instructor when on school grounds.

The custodian also said that J.A. became angry, yelled, blamed God for DSS's involvement, expressed his desire that DSS workers die, and then hit himself on the legs. After a 20-minute time out, J.A. calmed down and acted as if nothing happened. The week prior to the report, J.A. became angry about restrictions placed on a video game he played, yelled, said inappropriate things, and hit himself on legs and chest. J.A. calmed down after one hour.

### C.    Testimony

Social Worker Sanchez testified that he commenced his duties as case managing social worker for the instant case in October 2022. While still under order for supervised

15.

visitation, mother had unauthorized cellular phone contact with the three oldest children that he addressed with mother.

DSS granted permission for mother and father to have three-hour unsupervised visits with the children in early December 2022. DSS permitted unsupervised visits in the home but was concerned that the children should not sleep there based upon the "current bed situation, like sleeping arrangements, and the long-term cleanliness of the home."

Although Sanchez explained the importance of the domestic violence classes, mother and father left the state regarding a nonemergency family matter for two weeks in November 2022. Both mother and father required staff meetings to reconnect them with domestic violence classes[10] because of excessive absences and mother's request for referral to another service provider. Mother was enrolled in child abuse intervention classes and was absent six to eight times. Mother explained to Sanchez that she missed classes because of other court dates and because she had traveled out of state. Although the classes were provided to mother virtually, she still missed some while traveling out of California. Mother also requested that she be changed to a different provider to receive training for child abuse intervention classes because, mother stated initially, she did not feel she was learning from the classes. Mother later told Sanchez that her new job conflicted with the schedule of classes of the previous training provider.

Father missed approximately four child abuse intervention classes in September, only one due to a conflicting court appearance, and additional classes since then. Father explained to Sanchez that father had logged into the classes late a few times and was not allowed to participate, and that he had traveled out of state. The provider of the classes

---

[10] Mother and father were enrolled in child abuse intervention classes as part of the domestic violence classes. We use these terms interchangeably as did counsel during the hearing.

advised Sanchez that father was engaged in the service and had progressed " 'a little bit,' " but that the classes were placed on hold due to father's absences.

Sanchez testified that DSS had concerns that the children were at risk of physical abuse because mother and father failed to regularly attend domestic violence classes. Characterizing the parents' attendance as displaying a lack of engagement, Sanchez also expressed concern that mother and father would not be honest with DSS should domestic violence incidents occur in the home, given their previous efforts to conceal X.G.'s black eye from the school and police. Sanchez was not aware of any domestic violence incidents occurring between mother and father since he was assigned the case.

Sanchez also testified that mother and father required re-enrollment in random drug testing because they failed to test multiple times, and DSS believed such failure to randomly test did not dispel concerns of substance abuse. Father and mother had consistently tested negative for drugs in October 2022 but missed testing for two weeks in November 2022. Sanchez had advised both mother and father that DSS could not conduct random drug tests if they left California and would miss any tests required while they were away. Neither parent was testing at the time of the jurisdiction and disposition hearing, pending enrollment in the drug testing program, and had not been tested for approximately one and one-half months. However, Sanchez had no information that either parent had used drugs during that time, but he only saw them in person once a month.

Father initially failed to participate in substance abuse classes due to problems with his insurance but had enrolled after changing insurance. Father scheduled intake for anger management classes in early December 2022.

Sanchez testified that mother and father resided together, and he had inspected their home within two weeks prior to the jurisdiction and disposition hearing. The home was clean, clear of clutter, and organized. However, he observed roaches in one of the

children's bedrooms, which caused him to question the cleanliness of the home and posed a safety risk to the children.

Sanchez testified that mother had expressed a willingness to be more involved in her children's lives and make positive choices for the benefit of her family. Specifically, mother told Sanchez that she would be more communicative with her children as to their needs. Mother had engaged in "[m]ost" of her services, completed parenting class, and attended therapy, but Sanchez did not believe that mother was fully engaged given that she had to retake the domestic violence classes.

During a child and family team meeting, mother characterized the reason that her children were removed from the home was due to the physical abuse on her children and, representing a change of her previously expressed opinions, stated she should have been more protective of them. She did not discuss the condition of her home during this meeting. Mother also failed to include her drug use as a reason for the children's removal. Based upon this conversation, Sanchez believed that mother minimized the reasons that resulted in the removal of her children from the home.

Sanchez testified that the children wished to live with mother and father.

Mother testified that since the children were removed, she completed her externship as a medical assistant, graduated from the program, and worked at an urgent care as a medical assistant. She acknowledged that there were significant issues of cleanliness in her home but since the children were removed, she had washed their clothes, painted the walls, separated the beds in the boys' room, cleaned up the bathroom, determined and corrected the cause of the toilet malfunction, and purchased additional beds and dressers. She did not clean the carpets because they take too long to dry.

Mother claimed that when they first moved into the home, it did not have roaches, but when other nearby apartments were sprayed for roaches, the roaches moved to their apartment. The apartment was sprayed for roaches approximately six times between October and December 2022.

18.

Mother testified that she traveled with father out of California to visit her mother in Washington and her father in Idaho between November 5 and November 21, 2022.

Mother described changes she intended to make when the children were returned that included "really be[ing] there for them … emotionally," "clean[ing] up well, just after whatever I do," and keeping current with the laundry by cleaning the clothes after they remove them to shower. Mother also testified that, based on her conversations with father, father and mother intended to discipline the children using a "time[-]out bench." Mother explained that she was no longer angry at the world and wanted to be there for her children. Mother explained that parenting classes taught her that she needed to be more involved with her children. She learned that she should not use corporal punishment to discipline her children.

Mother testified that she has not used marijuana since she enrolled in random drug testing and has only used alcohol once. She drank alcohol because she missed her children. Mother was terminated from random drug testing based upon her out-of-state travel.

Mother testified that she did not believe she was benefiting from the child abuse intervention classes because she learned "the basics of the book" but did not like "how they made it seem like [ ] I was an angry person when I'm not always an angry person." Father appeared to learn more from his classes, and mother asked to switch her classes to another provider.

Mother and father still lived together, but father agreed to move out of the home to be reunified with the children if necessary. Mother had also arranged for her sister to watch the children until she was able to enroll them in day care and after-school programs. Regarding how her drug use affected the children, mother testified that she had learned the children would believe that they could also use drugs if the parents used them and that the parents needed to be sober for their children in order to deal with emergencies.

19.

When asked about father, mother testified that father became less hard after attending classes, that he knew he "messed up," and she "had a part in it, too." Father seemed happier since the children were removed, and mother and father communicated more. Mother believed that the children would be safe if returned to her home with father living there.

When cross-examined, mother testified that she believed that the children were safe with father in March 2022. On redirect examination, mother testified that she did not believe that father would ever hit their children and that this was the first time something like that had happened. After learning that father had hit X.G., mother was not okay with it and had him leave. Mother explained that she knows she should not have let him back to watch the children, but she could not find a babysitter because it was late at night, and she did not know what else to do. She explained, "I really had no choice," and that she didn't have any family except for her sisters. She said, "And it was late by the time that I actually saw [X.G.]" Mother stayed with father because she does not want her children to lose him and said that "we all make mistakes and I just can't judge him off this mistake that he made, you know." But she also acknowledged that if father changed for the worse, she would ask him to leave and would not work it out with him.

Father testified that he completed a parenting class but missed four child abuse intervention classes—three because he had internet trouble while in Idaho and one related to a court appearance. During that time, father also missed random drug testing, but he was not using drugs at that time. Father had not enrolled in the substance abuse program because of insurance issues that were only resolved the day before the hearing. Father acknowledged he should not have "laid a hand" on X.G. and claimed parenting and child abuse classes taught him the proper way to discipline. Father said he would place the children in "time out." On cross-examination, father testified that he did not use corporal punishment to discipline the children.

20.

### D. Jurisdiction and Disposition Order

On December 22, 2022, the juvenile court announced its decision. The court recited the facts set forth in the jurisdiction and disposition report and then concluded that mother knew X.G. had been injured but only asked father to leave the home overnight and "[t]here [was] no reason to believe she would take different actions now." The court observed that father's position "seem[ed] to be primarily that he wouldn't do it again." The court noted that mother testified that she believed it was safe for father to watch the children when X.G. was injured and that both mother and father significantly minimized the incident that brought them before the court. Furthermore, neither parent seemed to acknowledge the unsafe, unsanitary, and deplorable conditions of the home and the children's lack of hygiene. Neither parent had suggested any plan to remedy those conditions should the children be returned to the home. The court noted that father testified inconsistently as to whether he used corporal punishment to discipline five-year-old X.G., but that hitting X.G. constituted physical abuse. The court characterized the act of blackening X.G.'s eye as severe physical abuse: "[W]hile the father says it was accidental, that is simply a reflection of the father's minimization of the incident.… The father intentionally hit this child with enough force to cause this level of injury. He simply intended to inflict this injury on the mouth instead of the eye. The fact that he missed his mark and hit the eye instead does not cause this to be an accidental injury."

The court found true the jurisdictional allegations in the petition, including that mother's marijuana use impaired her ability to care for the children. Mother hid X.G.'s abuse from reporting authorities and permitted father to supervise the children right after.

The court found by clear and convincing evidence that there is or would be a substantial danger to the physical health, safety, protection or physical, or emotional well-being if the children continued to reside in the home and there were no reasonable means by which their physical health could be protected without removing them from the parents' physical custody. The court noted that while many months had passed since

21.

removal, mere passage of time was not sufficient to resolve the issues. The court found that the parents minimized the deplorable conditions of the home, the unhygienic and unclean condition of the children, the lack of clean clothing, and the injury to X.G. The court found that the parents' descriptions of a remedy for this condition was merely that they "just won't do it again." The court could find no evidence to suggest that mother would not hide future abuse from reporting authorities should father engage in such conduct in the future. In addition, the children had been coached to deny the abuse and would be pressured to deny any future abuse. Recognizing that the home was currently in acceptable condition, the court found that mother's ability to maintain a clean home while only two adults lived there was not an assurance that the parents' ability to do so would continue with eight children in the home.

The court found that DSS had made reasonable efforts to return the children but that both parents had only minimally progressed toward alleviating or mitigating the causes necessitating the children's removal from the home. The court ordered the children removed from the home of mother and father under section 361, subdivision (c)(1), and ordered continued unsupervised visitation and reunification services be provided for both parents.

Mother filed a timely appeal on December 23, 2022.

## DISCUSSION

Mother argues that substantial evidence does not support removing the children from her care because mother participated in services for eight months and alleviated many of the concerns that had resulted in the children's detention. In addition, DSS's decision to permit the children to have unsupervised visits with the parents in their home demonstrated a lack of substantial danger to the children if returned home. Mother also argues that a lesser alternative to removal of the children was to order father to leave the home and the court erred in failing to consider this alternative.

22.

## I.  Applicable law and standard of review.

Section 361, subdivision (c)(1), states that "[a] dependent child shall not be taken from the physical custody of his or her parents [or] guardian or guardians … with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence" of "a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor" and "no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's … physical custody."  Clear and convincing evidence "requires a finding of high probability."  (*In re David C.* (1984) 152 Cal.App.3d 1189, 1208.)  "A removal order is proper if it is based on proof of (1) parental inability to provide proper care for the minor and (2) potential detriment to the minor if he or she remains with the parent."  (*In re T.W.* (2013) 214 Cal.App.4th 1154, 1163.)

Before ordering removal, the juvenile court must determine "whether reasonable efforts were made to prevent or to eliminate the need for removal of the minor from his or her home" and "shall state the facts on which the decision to remove the minor is based."  (§ 361, subd. (e); see *In re D.P.* (2020) 44 Cal.App.5th 1058, 1065.)  Such facts may include "the parent's past conduct and current circumstances, and the parent's response to the conditions that gave rise to juvenile court intervention."  (*In re D.B.* (2018) 26 Cal.App.5th 320, 332.)

A juvenile court's dispositional order removing a child from a parent's custody is reviewed for substantial evidence.  (*In re Hailey T.* (2012) 212 Cal.App.4th 139, 146–147.)  In doing so, we must bear in mind the heightened burden of proof.  (*In re A.E.* (2014) 228 Cal.App.4th 820, 826.)  " 'In reviewing … the disposition, we look to see if substantial evidence, contradicted or uncontradicted, supports [the court's findings].  [Citation.]  In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of

fact and credibility are the province of the trial court.' " (*In re R.T.* (2017) 3 Cal.5th 622, 633, first bracketed insertion added.)  Mother has the burden of showing there is no evidence of a sufficiently substantial nature to support the findings or orders.  (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.)

## II.       Substantial evidence supported the juvenile court's dispositional order.

The juvenile court's dispositional order removing the children from mother's care was based, in part, on the court's finding that mother failed to protect her children from father's harmful actions.  Father admitted that he hit X.G. and caused the blackening and bruising of X.G.'s eye and cheek.  Mother also admitted that father had told her he caused the injury to X.G.  Father denied that he intentionally hurt X.G.'s eye and claimed that he intended to strike X.G. on the mouth, but X.G. moved his head, which resulted in the bruising of X.G.'s eye.  As the court noted, father's explanation erroneously implies that his action was wrong because he missed X.G.'s mouth and ignores the seriousness of his action in hitting X.G. at all, especially with force sufficient to leave a bruise, whether X.G. was struck in the eye or the mouth.

Mother also admitted that she permitted father to continue to supervise the children after discovering that father had hit X.G. hard enough to severely bruise his eye and cheek.  Her explanation that she needed father to return to the home to take care of the children while she was at work demonstrates that she did not sufficiently apprehend the danger to the children by father's use of force to discipline and lack of control in doing so.  Mother provided an excuse to the social worker for allowing father to return and stated that she did not know that father "was not supposed to be there," and she would not have permitted him to return had she known.  However, the court could conclude that mother's lack of judgment in appreciating the substantial risk caused by father's actions demonstrates her lack of ability or awareness to protect the children from such abuse.

24.

Additionally, both mother and father admitted that they did not either seek medical attention for X.G.'s injuries or call the police or social services to report the injuries, and actively concealed the abuse by preventing X.G. from going to school for two days. The court could conclude that these actions showed that the parents were concerned more with their relationship and attempts to the avoid the consequences of their decisions rather than to ensure the safety of the children. The court also noted that some of the children did not cooperate when initially questioned and some claimed that mother or J.P. had told them to either not discuss it or to lie about it. As the court noted, there was no evidence that the children would be permitted to discuss these matters if returned to the home nor that mother would actively encourage the children to discuss future problems in the home.

Therefore, substantial evidence supports the court's conclusion that mother had permitted father's access to the children after acts of abuse and concealed these acts of abuse from others. Additionally, there was substantial evidence from some of the children that she pressured the children to conceal these acts of abuse and lie to others.

Mother argues that the court only considered the circumstances that existed at the time the children were temporarily detained on March 30, 2022, and failed to consider "current circumstances" and "the parent's response to the conditions that gave rise to juvenile court intervention," relying on *In re M.V.* (2022) 78 Cal.App.5th 944, 967. We agree that the mere parental abuse or abuse-tolerance alone does not alone justify removal (see *In re Kieshia E.* (1993) 6 Cal.4th 68, 77), and the court is required to consider current circumstances and the parents' response to juvenile court intervention (see *In re M.V.*, at p. 967).

However, in this case, the court heard testimony from the social worker that mother had missed several child abuse intervention classes before being dropped from the class and was awaiting enrollment in another class. Father had similarly missed abuse classes and had not yet taken any anger management classes. Given the court's finding

25.

that the parents had only minimally progressed towards alleviating the conditions giving rise to the children's removal, the court did consider the circumstances existing at the time of the hearing in ordering the children to be removed.

Furthermore, *In re M.V.* found that the court had failed to consider the circumstances occurring since the incident where the social worker had testified that there was no safety risk with placing the children with the father. (*In re M.V.*, *supra*, 78 Cal.App.5th at p. 961.) However, in this case, the social worker testified that the children would be at risk in the home because the parents had not significantly progressed in correcting the conditions that created the need for temporarily detaining the children. Mother argues that Sanchez "had no concerns regarding domestic violence or substance abuse," but Sanchez's testimony that he was not aware of any "domestic violence incidents occurring between [mother] or [father]" did not ameliorate his concerns that the children would be abused. Sanchez testified the children were at risk of physical abuse because mother and father failed to regularly attend domestic violence classes and that their lack of engagement, evidenced by their spotty attendance at classes, continued concerns that mother and father would conceal future child abuse incidents because they had concealed X.G.'s black eye from the school and police and exercised pressure on the children not to speak of it.

Mother also argues that she began a 52-week child abuse intervention class and drug testing but fails to discuss her many failures to attend the class, her need to re-enroll in the class, and failure to randomly test, which caused the court to conclude that mother's progress was minimal.

We disagree with mother that *In re Henry V.* (2004) 119 Cal.App.4th 522 mandates that we reach a different conclusion. The court in *In re Henry V.* reversed a removal order stemming from burn marks on the child's buttocks because it found that neither the serious nature of the burns nor the need for the mother to complete a bonding study were sufficient reasons to remove the child where the burn marks arose from an

26.

isolated and unexplained incident, the bonding services could be provided in the home, and the agency was suing the mother's custodial rights to secure her compliance with services. (*Id*. at pp. 529–530.) In this case, X.G.'s injuries were caused by father intentionally and forcefully hitting X.G., and the social worker has not suggested that the children were removed to compel compliance with services. (See *In re L.O.* (2021) 67 Cal.App.5th 227, 246 [disagreeing with *In re Henry V.* that removal not supported when mother purposefully burned toddler with curling iron three times but claimed not to understand how injuries occurred and distinguishing more than one incident and placement not used as secure cooperation].) There are also concerns present in this case that were missing in *In re Henry V.*, including mother's failure to recognize that X.G. required medical treatment and father's actions required police or social services intervention, mother's action in permitting father to continue to care for the children, mother's attempts to conceal the abuse and prevent the children from speaking of it, and mother's willingness to stay with father.

Mother argues that visitation progressed to three-hour, in-home unsupervised visits, supporting her argument that there would be no danger to the children by remaining in the home long-term. However, this ignores the court's concern that any abuse would go undetected because mother's and father's progress with their services failed to provide assurance that they would no longer conceal abuse or fail to pressure their children not to disclose it. Limited visitation, however, protected the children because their custodians would detect and report any such abuse even if the children and parents did not.

Mother also argues that the court failed to consider a lesser alternative to removal, that being that father move out of the home. Even if father moved out of the home, he would still visit the children. Father's failure to progress with child abuse intervention classes, anger management, and substance abuse classes and testing presented a risk that he would abuse the children if he were angry or believed they needed discipline. If that

happened, the children would only be protected if someone reported the incidents of abuse, either mother or the children.

However, mother demonstrated her lack of judgment with regard to the risk of abuse by permitting father to supervise the children even though, as she acknowledged, she had sisters who were willing to help her care for them. Regarding father's abuse, mother testified, "[W]e all make mistakes and I just can't judge him off this mistake that he made, you know." Characterizing X.G.'s abuse as a mistake demonstrates a minimization of the serious risk posed by father's actions to the children's safety and a level of acceptance inconsistent with protection of the children. Based on such evidence, the court implicitly concluded that mother would not appreciate the substantial risk to the safety of the children if father abused one of the children and fail to act.

During testimony, mother claimed that she thought it was safe for father to care for the children in March 2022 because he had never hit them previously. However, this conflicted with J.P.'s statement to social workers that mother knew father had kicked J.A. in the stomach and J.A.'s statements to social workers that mother kicked father out of the home for several hours after father gave J.A. a bloody nose, by bashing his head into a counter, and kicked him twice in the stomach. Neither mother nor father have acknowledged this act of abuse as to J.A. J.A.'s statement is evidence that mother previously failed to report father's abuse and permitted father back into the home after such abuse.

The court found that the parents failed to appreciate the safety concerns to the children posed by the initial abuse and failure to report it. Given mother's past willingness to overlook father's abuse, testimony that exhibited a lack of appreciation for its seriousness and excuse of father's behavior, and only minimal progress in the child abuse intervention classes, substantial evidence supports the court's conclusion that a substantial danger still existed to the children because mother minimized the dangers that

28.

caused the removal of the children, and no evidence demonstrated that she would now report the abuse or fail to pressure the children into silence.

Viewing the record, as we must, in the light most favorable to the juvenile court's determinations, we conclude that in addition to the evidence supporting the jurisdictional finding of risk of harm, mother's failure to appreciate the substantial risk of harm caused by father's actions, efforts to conceal the abuse, and her incomplete participation in recommended services at the time of the jurisdiction and disposition hearing together constitute substantial evidence supporting the juvenile court's finding that it was necessary to remove the children from mother's custody at that time pursuant to section 361, subdivision (c)(l).[11]

## DISPOSITION

The dispositional order is affirmed.

---

[11] In light of this conclusion, we do not address the other bases for the court's dispositional order, such as the parents' failure to provide a sanitary and hygienic living environment and clean clothes.